REDMANN, Judge.
Plaintiff sublessor appeals from a judgment refusing to enjoin use of an alleyway by defendant, its sublessee, both for vehicular traffic and for overhead conveyors between defendant’s building situated on its own land and a building constructed by it on land it rents from plaintiff.
Defendant operates a brewery. Parts of its operations are conducted in buildings situated on either side of the alley, and there are railroad spur tracks in the alley. The building on one side of the alley is situated on land subleased from plaintiff.
*271 The original sublease of July 29, 1964, both verbally described the land and referred to it “as outlined and described in red” on an attached plot plan. In many respects the description and the plot plan do not coincide (the description’s configuration has 12 sides, the plot’s only seven). The description’s measure gives a Perdido street front measurement (282' 11" 6"') equal to that of sublessor’s own lease, which would include the alley; the plot’s red line would exclude it.
About a year later there was some question over the amount of the rent, which was a stated total but was based on 600 a square foot. Plaintiff wanted the rent increased by an amount equivalent to 600 times the 2,408 sq. ft. of the alley. This resulted in an agreement of August 31, 1965,[1] amending the lease “to more specifically designate the exact measurements and square footage”. The amended description closely followed the original description, with trifling differences in measurements except in one respect: the Perdido front measure was reduced some 17' to 265' 9%,/-Thus it seems clear that the alley was excluded from the description of the leased premises. However, the total square footage leased remained virtually identical, increasing insignificantly from 37,410 to 37,415.94 (without any increase in rent).

Vehicular Rights

Meanwhile, however, a letter agreement dated August 4, 1964 (shortly after the original sublease) was signed by plaintiff and defendant and the Illinois Central Railroad. The railroad’s spur track exists in the alley under an agreement with the owner which obliged the owner to furnish the ground for “use and maintenance of the track * * * and give the railroad secure and exclusive possession of the said ground * * The owner was obliged to “permit no obstruction within 8V2 feet of the center line of said track.” (The owner’s part of the alley is less than 15' wide; 17' was apparently required.) Despite this “exclusive possession” clause, the owner’s lease to plaintiff did include “the spur tract [sic; track?] in the rear of the building.”
The letter of August 4, 1964 recited the railroad agreement with the owner of the property in dispute, and also recited a similar agreement with defendant Falstaff covering another, parallel spur on that part of the alley owned by Falstaff. Noting operational changes and additional building by Falstaff, and Falstaff’s authorization to retire the track on its land, the letter states Falstaff’s request for permission to install concrete paving over and around the other track (that on the land in dispute) “to permit the driving of trucks and fork lifts of Falstaff Brewing Corporation over and across said part of track.” By the letter both the railroad and plaintiff granted Falstaff that permission, in consideration of Falstaff’s assuming full cost of all maintenance, replacement, etc. on the 153' of track affected. This obligation had been the owner’s under the basic agreement with the railroad, and became plaintiff’s obligation under its lease obligation “to maintain the property in good condition; to make at its own expense all repairs or replacements of any kind * *
Thus this permission from plaintiff to defendant to use the property for vehicular traffic, if not already included as an accessory to the lease as hereafter suggested, is obligatory because it is not gratuitous but an obligation given in exchange for the assumption by defendant of plaintiff’s obligation to maintain the track.

Overhead Conveyor Rights

The Civil Code’s general conventional obligations articles are applicable to lease; C.C. art. 2668. Among these are articles on interpretation of agreements. The first *272 of these articles, art. 1945, states rules derived from the principle that “none but the parties can abrogate or modify” agreements. The first rule prohibits construing subsequent legislation as modifying and the others are:
“Second — That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
“Third — That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
“Fourth — That it is the common intent of the parties — that is, the intention of all — that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.”
There can be no doubt that the parties here always intended that Falstaff would have the use of plaintiffs part of the alley for two overhead conveyors (and for vehicular use). Because plaintiff Trinity, itself a lessee, was to have lease obligations to the owner, the actual proposal between Falstaff and Trinity had to be satisfactory to the owner as well.
Trinity’s lease, dated June 5, 1964, allowed subleasing (interestingly, only of parts with the same footage on the spur track as on the parallel street, Broad), and expressly approved the sublease to Falstaff, of which (though not yet executed) a copy was said to be “annexed hereto and made part hereof.” Trinity’s lease gave it the right to demolish existing improvements in order to build comparable or better buildings; but “demolition and erection of improvements are to be approved by Lessor, in writing, prior thereto.”
Falstaff’s sublease, though identical to Trinity’s lease in many respects did not contain this demolition for new construction clause. But the sublease was not executed until after Falstaff’s building plans had the approval of both the owner and Trinity. A letter from Trinity addressed to the owner sets forth the agreement reached at a meeting December 20, 1963, including approval of Falstaff’s “drawing No. 4-6339 dated 11-27-63 covering the type of construction and layout” of the new building (on which the owner agreed construction could begin immediately). Falstaff’s sublease, though executed July 29, 1964, commenced January 1, 1964 (as did Trinity’s new lease from the owner, though dated June 5, 1964).
The Falstaff drawing thus approved by Trinity shows construction of the two overhead conveyors (“bridges”) between Falstaff’s own building and two sections of the proposed new building. (It also shows an existing “dock” in Trinity’s part of the alley is to be demolished, and that the entire alley is to be paved.) Because the conveyors Falstaff was to construct would only connect Falstaff facilities, they would be of no use whatsoever except to Falstaff. It would be an “absurd consequence”, C.C. art. 1945 subd. 3, to construe the sublease predicated on this building plan to exclude Falstaff’s use of those conveyors.
We readvert to the railroad’s contract with the owner, giving the railroad “exclusive possession” of the track, and to Trinity’s lease from the owner, requiring that subleases have frontage on the track. Evidently Trinity could not lease its alley area to Falstaff: the railroad and any other sublessees were intended to have (at the least) use of the track, and Trinity could not have “cause[d] the [sub-]lessee [Falstaff] to be in a peaceable possession of the thing during the continuance of the lease”, C.C. art. 2692 subd. 3. Thus the failure of the description of the subleased premises to include the alley does not amount to an affirmative revocation of the written approval by Trinity of the overhead conveyors as part of the building Falstaff was to erect.
Not before us is the question whether Falstaff could obtain reformation of the lease agreement to reflect the true agree *273 ment of the parties, expressly and mutually stated in writing. See Prejeant v. Hero Lands Co., 244 So.2d 613 (La.App.1971).
The sole question is whether Trinity may enjoin Falstaff’s use of the alley for vehicles and the existing overhead conveyors[2] because not expressly authorized in the sublease. The answer is that such limited use is expressly provided by other mutual agreements and it therefore cannot be enjoined.
The judgment is affirmed.

. A photocopy of a duplicate original carbon copy bears this date. A ribbon copy original in evidence is undated. Both have the concurrence of the owners, dated the above date.

.A third conveyor, between Falstaff’s building and Trinity’s own facility, was later constructed to convey discarded boxes to Trinity for disposal. This is expressly approved by Trinity in a “service agreement” under which Falstaff pays it $800 monthly for this service.