**F.W. WOOLWORTH CO.,**
Plaintiff-Appellee,

v.

**BUFORD–CLAIRMONT COMPANY,**
Defendant-Appellant.

No. 84–8888.

United States Court of Appeals,
Eleventh Circuit.

Sept. 3, 1985.

R. Lawrence Ashe, Jr., Dorothy Y. Kirkley, Atlanta, Ga., for defendant-appellant.

Robert McCallum, Jr., Atlanta, Ga., for plaintiff-appellee.

Before RONEY and HILL, Circuit Judges, and PITTMAN *, District Judge.

---

* Honorable Virgil Pittman, U.S. District Judge for the Southern District of Alabama, sitting by designation.

JAMES C. HILL, Circuit Judge:

This case involves a rather complicated dispute arising out of the commercial lease of retail space in a shopping mall. However, the main issue on appeal is simply stated: whether the lessor/appellant's December 5, 1980 letter acted to terminate the lease. We hold that the letter was ineffective in terminating the lease, with the result that the lease continues in effect without a "percentage rent" clause.

## I. FACTS

### A. *Preliminary Facts—Lease and Assignment*

The material facts in this case are undisputed. In 1967, plaintiff/appellee Woolworth (the lessee) and defendant/appellant Buford-Clairmont (the lessor) entered into a commercial lease for 103,000 square feet of rental space in a shopping mall to be constructed by Buford-Clairmont in Atlanta (the Buford-Clairmont Shopping Center).[1] The lease was for twenty-seven years, and granted Woolworth options to renew for three five-year terms, or until 2009. The minimum rent to be paid under the lease was $143,966 annually; but the lease also contained a provision (article 5A) for additional "percentage rent" to be paid if the sales of Woolworth and its licensees in the store exceeded a certain annual amount. Article 5A also specified a three-step proce-

dure under which the percentage rent obligation would be eliminated: (1) tenant must give the landlord written notice of its intention to discontinue the operation of its store; (2) failure on the part of the landlord to exercise its ninety-day option to terminate the lease upon receipt of tenant's notice; and (3) discontinuation of the operation of tenant's store at any time thereafter.[2] If and when these three conditions were satisfied, Woolworth would be obligated to pay only the flat annual rent amount; the alternative "percentage rent" obligation would be of no further effect.

In January 1972, Buford-Clairmont assigned the Woolworth lease to Jefferson Standard Life Insurance Company (Jefferson Standard) as additional security for the loan used to finance the mall. The written assignment provided that Buford-Clairmont would not, without the written consent of Jefferson Standard, cancel the lease; and that any attempt by Buford-Clairmont to cancel the lease without such consent from Jefferson Standard "shall be null and void." Jefferson Standard, in addition to the assignment, obtained a separate written covenant from Buford-Clairmont that Buford-Clairmont would not exercise the option under Article 5A of the lease to terminate the lease without first obtaining the consent of Jefferson Standard. At the same time, Woolworth was given a written notice of this covenant by Buford-Clairmont, which notice stated that "we [Bu-

---

1. Woolworth was a major or "anchor" tenant in the mall; *i.e.,* a large established store which would hopefully attract other smaller stores into the mall.

2. The relevant part of article 5A states:

   Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option, to be exercised by notice in writing given to the Tenant within ninety (90) days after the date of mailing of the Tenant's aforesaid notice to the Landlord, to cancel and terminate this lease. If the Landlord exercises its said option, this lease shall cancel and terminate on the last day of the month next following the end of said ninety (90) day period and the Tenant

shall be released from any further liability under this lease.

   Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the terms of this lease shall be the rent more particularly set forth in said Article 5, and the word "minimum" in said Article 5 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraphs of this article shall be of no further force and effect.

ford-Clairmont] will not exercise the option given under Paragraph 5–a of the said lease to terminate it without having first obtained the consent of Jefferson Standard."

### B. *The Closing of Woolco Store, and Attempted Termination of Lease by Buford-Clairmont*

The Woolco store opened by Woolworth in the Buford-Clairmont Shopping Center never became profitable. Woolworth management eventually concluded that the dominance of other discount stores in the Atlanta market precluded effective penetration in the marketplace by Woolco. By the Spring of 1978, Woolworth began to consider closing three Atlanta-area Woolco stores, including the store in appellant's mall.

On October 23, 1978, Woolworth gave written notice to Buford-Clairmont of its intention to discontinue the operation of its store in the Buford-Clairmont Shopping Center. At that time Woolworth had made no arrangements for the closing but had begun to search actively for a creditworthy subtenant to take over the lease. On January 23, 1979, Philip Sunshine, the owner and manager of Buford-Clairmont, wrote to Woolworth that Buford-Clairmont considered the October 23rd notice invalid because it did not specify a closing date. Woolworth reiterated its position that the October 23rd letter constituted "binding" notice under the terms of the lease.

Woolworth did not immediately move out of the store, but continued its operations in the mall while seeking a suitable subtenant. The anticipated losses from continuing operations were less than the losses (in the form of continued rental payments on the lease) from an immediate closing. Also, the mall was in a precarious financial situation at the time, with 30–35% vacancy of retail space, and Woolworth feared that the immediate closing of the Woolco store would produce a "snowball" effect where customer traffic would decline and other tenants would be forced to close their stores, thus decreasing the potential for subleasing the store.[3] During this time, Mr. Sunshine apparently was cooperating with Woolworth in attempting to interest potential subtenants in the Woolco space.

On May 5, 1980, Woolworth signed a sublease agreement with Burlington Coat Factory Warehouse (Burlington) which provided for annual fixed rental payments by Burlington to Woolworth of $206,000. On June 28, 1980, approximately 20 months after Woolworth's initial written notice of its intent to discontinue the operations of its store, Woolworth vacated the premises and the Woolco store "went dark." Burlington took possession of the store under the sublease on August 1, 1980.

On August 19, 1980, Buford-Clairmont sent Woolworth a letter asserting that Burlington was a licensee of Woolworth; that Woolworth had thus not "discontinued" the operation of its store; and that it was therefore entitled to demand compliance with the percentage rent provisions of the lease. On September 9th, Woolworth's counsel responded by a letter asserting that Woolworth discontinued the operation of its store on June 28th; that Burlington was not a licensee of Woolworth; and that the percentage rent provision was no longer effective by virtue of compliance with the three-step procedure prescribed under Article 5A.

On December 5, 1980, Buford-Clairmont sent a second letter to Woolworth continuing to assert entitlement to percentage rent, and alternatively stating that if Woolworth's announced position regarding dis-

3. It was also in Buford-Clairmont's best interests that Woolworth continue operating until a subtenant was found. Mr. Kyle, Buford-Clairmont's leasing agent, stated that the mall was in a "rapidly deteriorating" and "truly distressing" state in 1978. Mr. Sunshine himself closed the Sunshine Department Store in the mall in October 1978. Mr. Kyle was worried that the "snowball effect" of store closings would make the center less attractive for new mall tenants and anchor tenants.

continuance and percentage rent was ultimately litigated in Woolworth's favor, Buford-Clairmont was treating Woolworth's September 9th letter as notice of Woolworth's election to discontinue its store, and was exercising its right under Article 5A to terminate the lease.[4] It is undisputed that at the time of this letter Buford-Clairmont did not have the consent of Jefferson Standard to cancel and terminate the lease.[5]

On December 12, 1980, Woolworth filed the present action seeking a judgment declaring the rights and obligations of each party under the lease. Buford-Clairmont filed a counter-claim, asserting that Woolworth was in breach of its lease through Burlington's alleged restriction of customer access to and from the mall.

### C. The District Court Proceedings

Woolworth moved for summary judgment. In its first order, on March 31, 1982, the district court denied the motion in part, holding that Woolworth had "discontinued operations" when it closed its Woolco store on June 28, 1980; that although Woolworth's initial October 23, 1978 notice of intention to discontinue operations was effective, there was an implicit lease requirement that Woolworth close its store within a reasonable length of time after notice; and that whether twenty months was reasonable was a question of fact for the jury to decide. The court granted Woolworth's

motion for summary judgment on the access issue, ruling that the lease did not require Woolworth to maintain a principal access between the retail space and the mall.

Woolworth subsequently filed a second motion for summary judgment. The district court granted the motion in part, holding, in a May 18, 1983 order, that if Woolworth's September 9, 1980 letter was a proper written notice of its intent to discontinue operations of its store (an issue the court declined to decide) then Buford-Clairmont's December 5th letter was an attempt to exercise conditionally its option to terminate the lease, and was thus ineffective.

For purposes of clarifying the issues for appeal, the parties then stipulated that Woolworth's September 9th letter was a valid notice of Woolworth's intent to discontinue operations of its store. The district court subsequently granted summary judgment to Woolworth on October 11, 1984, holding, per its March 18, 1983 order, that Buford-Clairmont did not effectively exercise its option to terminate the lease within the ninety-day period granted to it, and that the lease thus remained effective without the percentage rent provisions. This appeal followed.

## II. DISCUSSION

The primary issue on appeal is whether the district court correctly held, as a matter

---

4. The relevant portions of the letter provided:
   By letter of September 9, 1980 from Woolworth's attorney, Neal Batson, we have been advised of Woolworth's position that it has discontinued its store. Buford-Clairmont continues to maintain that the percentage rental provisions of Article 5A of the captioned Lease apply and, in view of the announced position of Woolworth to the contrary, we shall promptly institute appropriate legal proceedings for resolution of that issue.
   We deem Mr. Batson's letter of September 9, 1980 to be proper notice of Woolworth's election to discontinue its store if Woolworth's announced position regarding percentage rent is adjudicated in its favor, and, in accordance with the option given the Landlord under the captioned Lease, this is notice by Buford-Clairmont Company that the Lease

of March 2, 1967, as amended, is cancelled and terminated.

5. This was not just an oversight. At the time of the December 5th letter, Buford-Clairmont had written to Jefferson Standard requesting permission to terminate the Woolworth lease. Jefferson Standard was willing to consent to the termination only on the condition that Buford-Clairmont first prepay $300,000 of its outstanding loan. Buford-Clairmont rejected this proposal. On November 4, 1982, two years after the purported action terminating the lease, Jefferson Standard did agree to such a termination on the condition that Buford-Clairmont would prepay $300,000 of its loan at the time the release of the Woolworth lease was effective.

of law, that Buford-Clairmont's December 5, 1980 letter was an ineffective exercise of its right to terminate the lease.

In district court the parties stipulated that Woolworth's September 9, 1980 letter was a valid notice of its intent to discontinue the operation of its store pursuant to Article 5A. This was the assumption on which the district court based its order granting summary judgment in favor of Woolworth. We must abide by this stipulation for purposes of reviewing the district court's holding as to the effectiveness of Buford-Clairmont's notice of termination. If we affirm the holding that the notice was ineffective to terminate, we have disposed of the issues as to the rights of the parties. However, if we determine that Buford-Clairmont's termination *was* effective, Woolworth would have us consider the effectiveness of its earlier, October 23, 1978 notice of intent to discontinue operations [6] and the reasonableness of the twenty-month period between the notice and the closing of the store, since if such notice and closing were effective under Article 5A then Buford-Clairmont had waived its right to terminate by failing to exercise it within ninety days.

If we rule in favor of Woolworth on the main issue, we must additionally determine whether the district court correctly held that Woolworth was not required to maintain a principal access between the retail space and the mall.

### A. *Effectiveness of Buford-Clairmont's Notice of Termination*

The district court found that Buford-Clairmont had conditionally exercised its option to terminate the lease, and held that such exercise was ineffective as a matter of law. It also noted that, at the time of the attempted exercise of the option to terminate, Jefferson Standard had not consented to Buford-Clairmont's termination of the lease.

**6.** In the stipulation, Woolworth reserved the right to litigate whether this earlier notice was

### 1. *Conditional exercise of right to terminate.*

■ A landlord's notice of termination of a tenancy need not be in any particular form or employ any particular words, but must ordinarily be unequivocal, unconditional, and so certain that the tenant cannot reasonably misunderstand it. 51C C.J.S. *Landlord and Tenant* § 89(5)a (1968); *see Pitman v. Griffeth,* 206 S.E.2d 115, 118 (Ga.Ct.App.1974). Cases in which courts have held termination notices ineffective due to their conditional nature have involved notices which expressed a landlord's future intent to terminate the tenancy unless the tenant complied with certain conditions or cured certain defaults. *See, e.g., Kirschenbaum v. M.T.S. Franchise Corp.,* 77 Misc.2d 1012, 355 N.Y.S.2d 256, 260 (1974); *Hix v. Roy,* 139 Colo. 457, 340 P.2d 438 (1959) (en banc).

The instant case does not involve such a situation. The present intention of Buford-Clairmont to terminate was clearly expressed in its December 5th letter to Woolworth, and was conditioned only on a resolution, by the courts, that Woolworth's sublet to Burlington was a "discontinuance of operations" and that the September 9th letter was thus a proper notice of intent to discontinue. That dispute had to be resolved before Buford-Clairmont could ascertain whether it possessed the power to terminate the lease: under Article 5A of the lease, Buford-Clairmont had power to terminate only upon an effective notice from Woolworth of its intent to discontinue the operations of its store; if Woolworth's sublease to Burlington did not constitute a "discontinuance" of operations of its store, then Woolworth's September 9, 1980 letter informing Buford-Clairmont of the sublease was not an effective notice of Woolworth's intent to discontinue operations, and Buford-Clairmont thus had no right to

valid.

terminate.[7] Therefore, Buford-Clairmont had to express conditionally its exercise of its right to terminate on a finding that Woolworth had "discontinued" operation of its store.

The district court, in its March 31, 1982 order, correctly found that Woolworth had discontinued operations of its store when the store "went dark" on June 28, 1980. That being the case, Woolworth's September 9th letter was an effective notice of its intent to discontinue operations, and Buford-Clairmont was thus found to have had the authority under Article 5A of the lease to terminate. While Buford-Clairmont's December 5th letter attempting to exercise that authority may have been couched in conditional language, it did not express the sort of impermissible condition considered in the cases cited above. Because of our resolution of the issue discussed in part 2, hereafter, we need not resolve whether the "conditional" nature of the termination in the present case made the termination ineffective.

### 2. Failure to obtain lender's consent to terminate.

The written assignment of the Woolworth lease from Buford-Clairmont to Jefferson Standard as security for the loan used to finance the shopping center provided that any attempt by Buford-Clairmont to terminate the Woolworth lease without the written consent of Jefferson Standard would be null and void. Woolworth re-

ceived written notice of this provision. It is undisputed that Buford-Clairmont had not obtained such consent from Jefferson Standard at the time it attempted to terminate the lease by the December 5th letter. See supra note 5. The question is whether the termination was valid and effective against Woolworth without such consent.

Buford-Clairmont first maintains that Woolworth has no standing to enforce any rights under the assignment of the lease since the assignment did not confer any rights on Woolworth. This argument misses the point. The assignment of the lease from Buford-Clairmont to Jefferson Standard affected not the rights of Woolworth, but the powers of Buford-Clairmont.[8] When collateral is duly assigned as security for a debt, the assignee creditor acquires the title to the collateral which the assignor debtor cannot abridge. Darling Shop of Birmingham, Inc. v. Nelson Realty Co., 79 So.2d 793, 797 (Ala.1954); Travelers Insurance Co. v. Tallahassee Bank & Trust Co., 133 So.2d 463 (Fla.Ct.App. 1961); 6A C.J.S., Assignments § 82 (1975); see also Wright v. Home Beneficial Life Insurance Co., 155 Ga.App. 241, 270 S.E.2d 400, 402 (1980) (assignment of lease gives creditor additional security for the debt and "a degree of control over any changes in the terms of existing leases"). The assignor debtor merely enjoys a right of redemption upon payment of the debt, and any other rights and powers permitted

7. The discussion in this section assumes arguendo that Woolworth's original written notice of its intent to discontinue operations, sent October 23, 1978, may not have been effective due to the twenty-month lapse of time between the notice and the closing of the Woolco store on June 28, 1980; and thus that Woolworth's September 9th letter was the first notice of its intent to discontinue.

8. This is not to say that Woolworth's rights were unaffected by the assignment. While Woolworth had no part to play in the arrangement between Buford-Clairmont and Jefferson Standard, the result of that arrangement had a direct effect upon Woolworth's rights and liabilities under the lease. Until effectively terminated, Woolworth was liable for rent and had the right

to occupy the premises. Woolworth might not have standing to enforce any rights under the assignment itself; but once Woolworth received notice that Buford-Clairmont had itself submitted to a limitation which made its unilateral notice of termination "null and void," Woolworth was not free to accept a unilateral termination as a release of its liabilities and not bound to accept it as a termination of its rights. Indeed, the terms of the assignment itself grant Jefferson Standard the right to collect rents from Woolworth upon Buford-Clairmont's breach of the covenants in the assignment, indicating that Woolworth could not rely on Buford-Clairmont's unilateral termination.

by the assignment contract. *Darling Shop of Birmingham*, 79 So.2d at 797; *see Wright*, 270 S.E.2d at 402; *Travelers Insurance Co.*, 133 So.2d 463; 6A C.J.S. *Assignments* § 82. In assigning the lease to Jefferson Standard, Buford-Clairmont contractually relinquished its right and power to terminate the lease without the consent of Jefferson Standard. Without such consent, Buford-Clairmont was without any *power* to terminate the lease agreement. *Kingridge v. Bettercare Management Group, Inc.*, 361 So.2d 1001, 1004 (Ala. 1978); *Darling Shop of Birmingham*, 79 So.2d at 797–98 (Ala.1954); *cf. Wright*, 270 S.E.2d at 402 (assignment of lease gives creditor "a degree of control over any changes in the terms of existing leases"). A contrary holding would permit every secured lender holding an assignment of a debtor/lessor's interest in a lease to have the value of its collateral eliminated through a unilateral breach of the assignment contract by the debtor. That result would be unacceptable to both lenders and borrowers.

■ Buford-Clairmont also contends that Jefferson Standard's ultimate consent to the lease termination, obtained some two years after the purported act of termination (*see supra* note 5), cures any technical failure to acquire Jefferson Standard's consent at the time the lease was allegedly terminated. This argument is without merit. Such a holding would place the tenant, Woolworth, in the position of hopelessly inconsistent obligations: the obligation to vacate the premises since the termination might later be consented to by the lender, and the obligation to continue paying rent since the lender might not consent to the termination and could sue the tenant directly for rent under the terms of the assign-

ment. Such a situation would allow the debtor/lessor to test improperly the rental market by preserving the tenant's rental obligation under the lease through the lender's withholding of consent while, at the same time, positioning itself to reclaim possession of the rental space at some point in the future (if the market is favorable) through obtaining the consent to terminate from the lender.

■ Therefore, we hold, as a matter of law, that the consent of Jefferson Standard was necessary in order for Buford-Clairmont to exercise validly its option to terminate the Woolworth lease, and that such consent must have been granted within ninety days from Woolworth's notice of its intent to discontinue (the period within which the lease provided that Buford-Clairmont must exercise its termination right). Since Buford-Clairmont did not obtain Jefferson Standard's consent until nearly two years after its purported termination of the lease, the termination was invalid and of no effect. Since all three of the conditions enumerated in Article 5A of the lease had thus been met (tenant's written notice of intent to discontinue operations of its store; lessor's failure to effectively terminate within ninety days of such notice; and tenant's actual discontinuance of operations), the lease continues in effect without the percentage rent clause.[9]

B. *Did the Lease Obligate Woolworth (and thus its Subtenant) to Maintain a Principal Access Between the Retail Space and the Mall?*

■ The lease contained a clause requiring the landlord, Buford-Clairmont, to construct the retail stores in the shopping center "with a principal customer entrance to

9. We could imagine situations where a tenant might act in bad faith to cancel a percentage rent clause in a commercial lease. For instance, a lessee could sign a lease at a very favorable rental rate due to the shopping center owner's desire to secure a solid anchor tenant, and then immediately give notice of its intent to discontinue its operations in order to enter into a profitable sublease of the space. Such a scenario would bother us, but there is absolutely no indication that Woolworth was acting in bad faith in closing its store and subletting in the present case.

and from said malls for each store." Nothing in the lease requires Woolworth or its subtenants to maintain a principal access between the retail space and the malls. Nevertheless, Buford-Clairmont contends that "fundamental principles of shopping center operations" and the conduct of Woolworth subsequent to the signing of the lease demonstrate the intent of the parties to require Woolworth (and thus its subtenant, Burlington) to maintain exits with cash registers onto the main part of the shopping mall. We agree with the district court that the plain language of the contract fails to support this interpretation, and affirm the district court's grant of summary judgment in favor of Woolworth on this counter-claim.

The orders of the district court granting summary judgment to Woolworth on its declaratory judgment claim and on Buford-Clairmont's counter-claim are

AFFIRMED.