367 So.2d 773 (1979)
Warren J. TULLIER, Sr., et al., Plaintiffs-Appellees-Respondents,
v.
TANSON ENTERPRISES, INC., Defendant-Appellant-Relator.
No. 62636.
Supreme Court of Louisiana.
January 29, 1979.
*774 Leon Gary, Jr., Gary & Field, Baton Rouge, for defendant-appellant-relator.
A. J. Spedale, Spedale, Sanders, Pennington & Grimley, Baton Rouge, for plaintiffs-appellees-respondents.
TATE, Justice.
The issue before us is whether a tenant is required to continue to maintain leased *775 premises as a shopping center, where the long-term lease itself contains no clause expressly requiring the premises to be so used, but riders attached to the lease indicate that the parties foresaw at the time of its confection that at least the initial use would be for a shopping center.
The issue arose in litigation whereby the owners of the premises sought to cancel the lease upon certain contentions of default. Ultimately, the court of appeal denied cancellation, but it agreed with the trial court that the lease intended that the property be used for shopping center purposes. 359 So.2d 654 (La.App. 1st Cir. 1978). Upon the application of the tenant ("Tanson"), we granted certiorari, 362 So.2d 578 (1978), in order to decide the issue stated in the initial paragraph of this opinion.
Background Facts
The details of the lease will be set forth more fully below. By way of background, the following are some of its relevant provisions:
The lease of 20 acres of vacant ground had been executed in 1958 for a term of 25 years, with the tenant being given the right to renew it successively for a total of 99 years in all. The tenant's obligations under the lease and its renewals were to pay a fixed monthly rental and to pay all expenses (taxes, etc.) of the property.
The tenant was given the right to assign or sublet without consent of the landlord-owner, to construct buildings and other improvements on the land, or to demolish any so built (provided a building of equal value was constructed to replace it). The buildings constructed by the tenant were to become the property of the landlord-owner.
The plaintiff-landlords are the widow and heirs of the original lessor. Through a series of assignments, the present defendant tenant ("Tanson") now holds the ground lease.
A shopping center with two buildings and a large parking lot was constructed by Tanson's predecessor tenants on about ten acres of the tract, soon after the lease was executed in 1958. The present tenant, Tanson, has held the lease since 1963.
However, before the present litigation, Tanson lost its two major tenants (which operated retail outlets in the two buildings under two separate subleases). The buildings, especially one of them, had then fallen into disrepair.
Due to a decline in the neighborhood, Tanson was unable to secure subtenants to operate retail stores on the leased premises. It therefore planned, upon repairing the buildings, to do so for the purpose of renting them for warehouse or storage facilities.
The plaintiff-landlords rely upon a rider to the lease in their contention that the buildings must be repaired to conform with the initially intended use of the lease premises for a shopping center, despite the absence of a clause in the lease expressly providing this to be the purpose of the lease. The previous courts agreed with this contention and held that the intention of the parties to the lease was to utilize the premises for a shopping center (only).
The primary significance of this holding in the present litigation is that it determines the extent and nature of the required repairs to the two buildings on the premises: Must they be restored to be fit for occupancy and use by retail outlets in a shopping center, although the neighborhood will no longer support a shopping center? Or, instead, may they be repaired to serve as warehouses, for which subtenants may be secured on the present rental market?
Applicable Legal Principles
The Louisiana Civil Code provides that a tenant is required to utilize the property leased as a good administrator and according to the use for which it was intended by the lease. Article 2710(1) (1870). The landlord-owner may obtain the dissolution of the lease if the tenant makes another use of the premises than that for which it was intended. Article 2711 (1870).
The lease itself may expressly provide the purpose for which the premises are *776 leased and for restrictions on the use of the leased premises. Reilley v. Kroll, 197 La. 790, 2 So.2d 214 (1941). However, in determining the "intended use" under the lease, the courts may, in the absence of express lease provision, look to the surrounding circumstances, such as the nature, situation and previous use of the property. New Orleans and Carrollton R.R. v. Darms, 39 La.Ann. 766, 2 So. 230 (1887); Comment, The Louisiana Law of Lease, 39 Tul.L.Rev. 798, 856-59 (1965); Planiol, Civil Law Treatise, Vol. 2, No. 1691 (LSLI Translation; 1959).
In his occupancy of the property the tenant is obligated not to use the premises for a purpose inconsistent with that contemplated by the parties at the time they confected the lease. Caffin v. Scott, 7 Rob. 205 (La.1844).
Relying upon these principles, the plaintiff-landlords point out that, at the initiation of the lease, the parties contemplated that the property (or at least a substantial portion of it) would be used as a shopping center. They thus contend that the initially intended use of (part of) the property is the only use contemplated by the parties.
This contention might be forceful, were we concerned with a lease shown to have been intended to confer some advantage to the landlord by continued operation of the premises as a shopping center. However, the present lease construed as a whole, to the contrary, shows that the tenant was intended to have free use of the leased premises for whatever lawful purpose it desired, nor does it reflect that within the contemplation of the parties any restriction upon such use by the tenant was contemplated by the parties:
The Present Lease
In 1958, the late Benjamin Tullier and his wife leased a vacant 20-acre tract of land to the original tenant. Through a series of assignments Tanson, the present defendant-tenant, acquired all lessee rights (and became subject to all lessee obligations) under the lease.
The tenant's principal obligation under the lease was to pay a fixed monthly rental of $750 and all taxes and other expenses of the property. The lease was renewable for up to 99 years.
Under the terms of the lease, the tenant was afforded the right to make at its own expense any improvements, alterations, or additions to the premises as it desired, which were to become the property of the landlord. (Art. 15.) The tenant was also given the right to demolish any structures so built, providing that it constructed a new building of equal or greater value. (Art. 15.) The tenant also agreed to keep in good repair the roof, exterior and interior, and appurtenances (including sidewalks) of any buildings thereafter placed upon the premises. (Art. 11.)
The landlord also agreed to deliver the premises to the tenant "free of liens, encumbrances, and violations of laws, ordinances, and regulations relating to the use, occupation and/or construction of improvements on the demised premises." (Art. 8.)
The lease also granted the tenant the "full and complete right to assign the whole of this lease or any part thereof or to sublet the whole or any portion of the demised premises." (Art. 22.)
The only provision restricting the use of the premises is that set forth in Article 7 of the lease: "The premises hereby demised shall not be used for any unlawful purpose during the term of the lease." The lease does not contain any covenant requiring the tenant to either continuously use or continuously occupy any part of the leased premises.
Thus, the provisions of the lease as a whole grant the tenant the virtually unrestricted right to use or alter or sublease or assign the premises as he wills. During the initial or extended (up to 99 years) terms of the lease, the tenant's principal obligation, aside from paying the taxes and expenses of the property, was principally to pay the fixed monthly rental of $750 and to keep in repair any buildings that within his discretion he had built upon the property (or to replace them with buildings of equal value if in his discretion he demolished them).
*777 Nevertheless, the plaintiff-landlords, in urging that the two buildings on the premises must be kept in repair for chain-store occupancy purposes, rely upon two riders executed in connection with the construction of one of the buildings (on an acre of the 20-acre tract) and upon two zoning clauses, as showing an intention to restrict the use of the premises to a shopping center.
The intermediate court essentially agreed with this contention.
Did the Riders and Zoning Clauses Restrict the Intended Use of the Premises?
In finding that the lease implicitly required the use of the property as a shopping center, the court of appeal relied solely on Riders C and D, which respectively conditioned the effectiveness of the lease upon the tenant's consummation of a sublease with a chain store, and required the tenant to build a building "designed for chain store occupancy," and on the fact that during the term of the leasethat is, from the time the buildings were built until their abandonment by the subtenantsthey were used as chain stores.
This conclusion fails to give sufficient weight to all the circumstances surrounding the lease.
At the time the lease was confected, the property was undeveloped. The lease was for a long term, renewable for up to 99 years. This gives rise to an inference that the parties could not predict with certainty what the most profitable use of the property would be, and would have wanted the intended use to be flexible.
This inference of flexibility is bolstered by the fact that the lease provides for a fixed monthly rental rather than a rental based on a percentage of sales, revenues or profits. The latter arrangement, a common one in shopping center leases, would have suggested that the lessor had an interest in continued use of the property for shopping center purposes.
The numerous provisions cited above, warranting the property as free from "agreements" or "encumbrances, ordinances and regulations relating to the use, occupation and/or construction of improvements," and granting the tenant the right to make changes and improvements and to sublet without permission of the lessor, suggest a broad range of intended uses.
Finally, the "use clause" expressly prohibits unlawful uses of the property, and makes no mention of any other prohibition. This gives rise to the inference that no other prohibition on the use of the leased premises was intended: It would have been easy for the parties to prohibit any use other than for a shopping center, and they did not.
Even in the absence of these indicia, which suggest that the parties intended flexibility, the circumstances relied upon by plaintiff-landlords would leave the intended use ambiguous:
The use of the property after the confection of the lease, without more, indicates only that the lessee found it profitable to use the property for a shopping center. It does not necessarily suggest any intention to exclude other uses.
Rider "C", providing that the lease would not be effective unless the tenant could obtain a chain-store subtenant, can easily be construed as a protection for the lessee (an "investor/tenant" who never contemplated actual occupation of the premises except through a subtenant). Although it incidentally casts light on the initial use to which the lessee intended to put the property, it is hardly unambiguous evidence that the lessor intended to bind the lessee to such a use for 99 years.
Likewise, Rider "D," binding the tenant to construct a building suited for chain-store occupancy and of a stipulated minimum value, can be seen as merely part of the consideration paid by the lessee: at the termination of the lease, the lessor will own developed rather than undeveloped property. There is at least room for doubt whether this provision also reflects the intent to establish an exclusive permissible use of the building so constructed on one acre of the premises, let alone of the entire leased twenty acres.
*778 Article 6a or Rider "E," likewise relied upon by plaintiff-landlords, might also be construed as establishing an "intended use," by conditioning the lease on a change to commercial zoning. (Shopping centers require commercial zoning, whereas warehouses are an industrial use.) However, commercial zoning would permit a wide range of uses other than chain-store shopping centers, the argued exclusive use; and in any case, this clause is fully compatible with construction as a further protection for the investor/tenant, who indisputably wished initially to build a shopping center on the property.
Thus, all the circumstances relied upon as suggesting that there might have been one "intended use" within the meaning of articles 2710 and 2711 are equally consistent with a more flexible construction of the lease. Consequently, the rule that ambiguities in a lease should be construed in favor of the tenant will govern. Governor Claiborne Apartments, Inc. v. Attaldo, 231 La. 85, 90 So.2d 787 (1956), and cases cited therein. Moreover, the circumstances discussed above, affirmatively suggesting that the parties intended flexibility in the use of the property, would probably resolve the ambiguity in favor of the tenant even in the absence of this settled rule of law.
Initial Use the Only Intended Use?
The plaintiff-landlords essentially rest their contention upon the theory that the initial use of leased property is ipso facto the only intended use.
Nothing in the Civil Code articles suggests such a doctrine. The French authorities cited to us only state that, where the lease is silent, the use which the leased premises should receive should be determined according to the circumstances. The example given by Planiol"For example, it is often easy to see that a house has been rented to live in and not for a cafe or a hotel," Planiol, cited above at Vol. 2, No. 1691does no more than suggest, as Louisiana decisions have held, that the tenant may not use the premises for a purpose inconsistent with that contemplated by the parties at the time they confected the lease.
In the present lease, however, the parties contemplated, as we have noted, free and flexible use by the tenant of the premises during this long-term lease. The landlord's only shown interest is to receive fixed monthly rentals and the ownership and continued repair of buildings erected by the tenant, with the latter being given full discretion to demolish any such structures provided he replaces them with those of equal or greater value.
Here, for instance, the landlord has no economic interest in the use of the premises for a shopping center rather than as a warehouse. Nor does the landlord have any shown benefit in having the structures on the premises constructed by the tenant to be devoted to one purpose rather than another, provided that they are kept in good repair for delivery to the landlord at the expiration of this long-term lease. Cf. Caffin v. Scott, 7 Rob. 205 (La.1844), where the use of the leased first floor for a kitchen instead of its intended use as a store caused great inconvenience to upper-store tenants who threatened to abandon the premises.
We are thus unable to agree that the initially intended use of the premises in this long-term lease was the only intended use of the premises required or permitted by the lease.
Conclusion
The recent jurisprudence of the courts of appeal has established the distinction we draw here, between an initially permitted, as contrasted with a required, use of leased property within the intent of Civil Code Articles 2710 and 2711.
Thus in Riverside Realty Co. v. National Food Stores of Louisiana, Inc., 174 So.2d 229 (La.App. 4th Cir. 1965), certiorari denied 247 La. 1037, 175 So.2d 647 (1965), even a provision that the rent was to be based on a percentage of total revenue from the leased property (or a stipulated minimum rental, whichever was the greater figure) was not enough to require the tenant to continue operation of its unprofitable grocery *779 store instead of using it for storage purposes only.
And in Mancuso v. Sigmor Distributing Service, Inc., 356 So.2d 1035 (La.App. 1st Cir. 1977), the lease contained two clauses similar to those relied upon here by the plaintiff-landlords: (1) a clause granting lessee the right to make improvements "for the purpose of operating thereon a service station or filling station," and (2) a provision conditioning the lease on the lessee's obtaining the necessary permits to build and operate a service station. Nevertheless, the lease was held not to reflect any exclusive intended use of the property, since "[h]ad it been intended that the premises be restricted to only service station use a simple unambiguous statement to that effect would have been easily incorporated in the lease." 356 So.2d 1036.
Accordingly, where the lease is silent as to the intended use of the premises, we hold that the circumstances must clearly show that the parties intended only a certain use of the property in order for such use to be deemed the exclusively "intended" use within the meaning of Articles 2710 and 2711. Evidence of the contemplated initial use is relevant in this regard, but it is not decisive. Where the silent lease and the surrounding circumstances are ambiguous concerning intended use, this ambiguity must be resolved in favor of the lease.
Where, as here, the entire thrust of the lease was to allow the tenant full flexibility of development of the property, the lease was for a long term, the property was initially undeveloped, the rental was a fixed monthly amount, and there were no other special circumstances such as adjacent property belonging to the landlord and adversely affected by the use made of the leased property, we conclude that no exclusive use as a shopping center was intended.

Decree
The judgment of the court of appeal is reversed insofar as it required the use of any part of the leased property as a shopping center, or prohibited use of such property as a warehouse, and judgment is accordingly rendered for the defendant-relator, Tanson Enterprises, Inc. The costs of the proceedings in this court are assessed against the plaintiffs-respondents.
REVERSED AND RENDERED.
SUMMERS, C. J., dissents for the reasons assigned by the Court of Appeal. See 359 So.2d 654.
BLANCHE, J., not participating.