Sidney E. COXE, Lamar N. Coxe,
Ralph C. Jenkins, Dewanna
Atkinson

v.

F.W. WOOLWORTH COMPANY.

Civ. A. No. 84–696–A.

United States District Court,
M.D. Louisiana,
Division "A".

April 11, 1986.

Davis B. Allgood, Gary, Field, Landry &
Dornier, Baton Rouge, La., for plaintiff.

Paul M. Hebert, Jr., Dorothy Dubroc
Thomas, Breazeale, Sachse & Wilson, Baton Rouge, La., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

The plaintiffs in this matter are the owners and lessors of certain property in the Acadian Village Shopping Center in Baton Rouge, Louisiana. All plaintiffs are citizens of the state of Louisiana. Defendant, F.W. Woolworth Company, is the lessee of the property and is a corporation organized under the laws of the state of New York. The plaintiffs have brought this action, seeking a declaration as to their rights under the lease, and the defendant has counter-claimed to obtain a declaration of its rights under the lease. The amount in

controversy exceeds $10,000, exclusive of interest and costs, and this court therefore has jurisdiction over the subject matter of this lawsuit by virtue of 28 U.S.C. § 1332.

In early 1972, plaintiffs leased certain property within the Acadian Village Shopping Center to the defendant. The lease provided for a building to be constructed by the lessors to the lessee's specifications for the lessee's exclusive use, plus certain easements, access rights, and appurtenances thereto, as the "demised premises." The lease also granted the lessee the right to use certain common facilities, such as sidewalks and parking areas, on a shared basis with other tenants of the shopping center. The lease was for an initial term of 20 years, with four successive options for extended terms of five years each, for a total possible lease term of 40 years. The lease called for a minimum annual rent of $247,586, plus a percentage rental in the amount of 1% of gross annual sales in excess of $7,000,000. By letter dated October 4, 1982, the defendant notified lessors of its intent to discontinue operation of the store and on January 15, 1983, ceased doing business in the leased premises as part of its nationwide closing of some 300 Woolco stores. Since that time, the defendant has continued payment of the minimum annual rent, pursuant to the terms of the lease, and has attempted to locate a sublessee or sublessees for the property. The dispute between the parties arose as a result of these efforts by the defendant to obtain a sublessee.

The first disputed issue is whether the defendant or its sublessee must continue to use the premises for a retail department store, or whether the leased premises may be put to some other commercial use, such as for entertainment facilities or business offices.

A second issue presented in this case is whether the percentage rentals will recommence when and if the lessee or a sublessee resumes business operations upon the leased premises.

The third issue involved in this lawsuit concerns the right of the lessee to sublet the "Demised" premises, and the extent of the premises which it can sublet.

There is very little dispute between the parties concerning the facts of this matter; the issues presented involve the interpretation of the contractual obligations, as those are expressed in the lease contract and as they may be interpreted according to Louisiana statutes and jurisprudence. Sitting as an *Erie* court, we must apply the rules of contractual interpretation which have been developed in Louisiana law. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). However, with reference to the precise issues before the court in this matter, those rules are sometimes in conflict, and the jurisprudence reflects that conflict. For instance, the general rule of contractual interpretation, as expressed in Louisiana Civil Code Article 2056 (formerly Article 1958) states, "In case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished the text. A contract executed in a standard form of one party must be interpreted, in case of doubt, in favor of the other party." In the matter before the court, the evidence shows that the lease contract is on a standard form prepared by Woolco, and only a few changes have been made to the lease language. (It is not entirely clear which party initiated these changes.) Under this provision, therefore, if the court determines that certain language in the form is unclear, it should be interpreted against the defendant, Woolco, on whose standard form the contract was prepared. However, the Louisiana jurisprudence has developed a strong tradition of interpreting any ambiguity in a contract of lease against the lessor and in favor of the lessee, regardless of which party prepared the lease. *Tullier v. Tanson Enterprises, Inc.*, 367 So.2d 773 (La.1979); *Bunch v. Heck*, 440 So.2d 820 (La.App. 1st Cir.1983) *writ den.* 444 So.2d 1219 (La. 1984); *Benchabbat v. Fidelity Acceptance Corp.*, 441 So.2d 398 (La.App. 4th Cir.1983); *Harper v. Thompson*, 347 So.2d 1207 (La. App. 1st Cir.1977); *Beebe v. Schmitt*, 308

So.2d 887 (La.App.2d Cir.1975); *Martin v. Martin*, 181 So. 63 (La.App. 1st Cir.1938); cf. *Aguillard's Enterprises, Inc. v. Smith*, 439 So.2d 1158 (La.App. 4th Cir.1983), *writ den.* 444 So.2d 1224 (La.1984). As the court stated in *Bunch v. Heck, supra*, at 821, "It is well settled in Louisiana that any ambiguity in a contract of lease will be construed against the lessor, since he had the power of stipulating in his own favor and neglected to do so." The history of these principles suggests that the law developed to protect the weaker party, usually the lessee, from any overbearing or imposition from the stronger party, traditionally the lessor, which prepared the contract. The parties to the transaction before this court, however, are both commercially knowledgeable and capable of dealing at arm's length concerning the business transaction represented by the lease contract, and thus neither requires this court's protection in interpreting those contractual provisions. The court will also be guided by other provisions of the Louisiana Civil Code, including Articles 2045 and 2046 (formerly Article 1945), which state:

Art. 2045. Interpretation of a contract is the determination of the common intent of the parties.

Art. 2046. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.

■ Keeping the foregoing principles in mind, we turn to plaintiffs' first contention that Louisiana law imposes upon every lease an implied condition that the lessee (or sublessee) must continue to use the leased premises in accord with the use intended by the parties when the lease was confected, and that the Civil Code of Louisiana mandates that this "intended use" be

the exclusive use of the leased property during the term of the lease. Plaintiffs rely upon several provisions of the Louisiana Civil Code, which state:

Art. 2710. The lessee is bound: (1) to enjoy the thing leased as a good administra ·, according to the use for which it was intended by the lease. (2) to pay the rent at the terms agreed on.

Art. 2711. If the lessee makes another use of the thing than that for which it was intended, and if any loss is thereby sustained by the lessor, the latter may obtain the dissolution of the lease....

Art. 2681. He who possesses a thing belonging to another, may let it to a third person, but he can not let it for any other use than that to which it is usually applied.

Plaintiffs urge that the above-cited provisions, when applied to the lease at issue in this case, require Woolco or its sublessee to use the leased premises for no purpose other than as a retail department store. They argue that the parties intended such use of the premises, that the lease reflects this intent of the parties,[1] that the premises were actually put to such use by Woolco, and that therefore, this court is bound to find and declare that the leased premises can be put to no other use than as a retail department store.

Defendant does not dispute that the use originally contemplated by the parties was for the business conducted on the premises to be a retail department store. Nor does defendant dispute that it did operate a retail department store on the leased premises for nearly ten years before discontinuing the business. And in fact, defendant admits that the only business in which the Woolco division was ever engaged was the business of operating retail department stores. Defendant's argument is that it

---

**1.** Article 6. of the lease contains a provision whereby the landlord warrants that there are no restrictive covenants, building or zoning restrictions, etc. "which will prevent the Tenant from conducting a department store business." Article 27 provides for the construction by lessors of a retail store building according to lessee's specifications. Article 31 contains a restrictive covenant which provides that no other space in the shopping center will be used or occupied as a variety store, junior department store, department store or discount store. Additionally, Article 5A includes a rental payment based upon a percentage of gross sales exceeding a certain amount which implies a retail sales operation.

never intended to be bound to an *exclusive* use of the premises for these purposes, simply because this was its original intent, and asserts that the lease reflects flexibility, not rigidity, in the contemplated uses for the property. Defendant points out that the lease does not contain any specific statement limiting its use of the property to retail department store operation, and argues that if it were the intent of the lessors to so restrict the use of the property, they should have included a specific clause to that effect. Article 15, part of the standard lease form, provides that the tenant has the right "to sublet the demised premises or any part thereof...." A provision has been added, presumably by plaintiffs, that, "The Tenant agrees that Tenant will not sublet to a supermarket as long as there is one open and doing business" in the center. Defendant argues that the inclusion of this single restriction on the use of the property shows the intent that the use of the property would be otherwise unrestricted. Defendant urges the court to find that the intended use of the property is more expansive and inclusive than plaintiffs have suggested, and that other commercial activities can be conducted on the premises without violating the lease or the Louisiana Civil Code.

Although the court allowed plaintiffs to introduce parol evidence as to their intent that the Woolco building be used only for a retail department store, such evidence cannot prevail over the clear provisions of the contract. The lease itself unambiguously grants the tenant the right to sublet *except to a supermarket.* Plaintiffs argue, however, that such language in the lease con-

fers only the unrestricted right to sublet the property to others *for use as a retail department store,* which they declare is and was the intended use. The language contained in the lease negates any such restricted use. It clearly says that the premises can be sublet for any lawful commercial purpose except to a supermarket. Those words are clear and explicit and lead to no absurd consequences, hence no further interpretation may be made. La.Civ. Code Art. 2046.

Assuming for purposes of argument, however, that the lease document itself is silent on the question of whether the originally intended use for the leased premises is to be the exclusive use thereof, the court must allude to the surrounding circumstances in order to resolve this issue. *Kizer v. Burk,* 439 So.2d 1051 (La.1980); *Tullier v. Tanson Enterprises, Inc.,* 367 So.2d 773 (La.1979). The cited cases are the latest expressions of the Louisiana Supreme Court on this issue.[2] The *Kizer* case involved a sale of standing timber on the leased property by the lessee, an act which was clearly beyond his contractual or statutory authority, regardless of whether it coincided with the intended use for the property by either of the parties. Therefore the facts of the case do not lend themselves to comparison with the matter before this court. However, the same principles of analysis were used by the court in the *Kizer* and *Tullier* cases, and can be applied to the facts of the instant case. The *Tullier* case, while it is factually distinguishable in some aspects, outlines the basic principles which are to be considered in resolving the issue of "intended use" of

**2.** The court has read with interest the comments of the doctrinal writers which were submitted by plaintiffs in support of their position, and has considered the early Louisiana case law on this subject. Several common themes run through the writings and the early cases, none of which are applicable to the matter before this court. For instance, a common situation involved rooms in a residence being let, in which case the lessee was not allowed to use the premises for commercial activities which would undermine the residential character of the property or disturb other residents. See, e.g., *New Orleans & Carrollton R.R. Co. v. Darms,* 39 La.

Ann. 766, 2 So. 230 (La.1887); *Caffin v. Scott,* 7 Rob. 205 (La.1844). A second major theme involved the situation in which a going business concern is leased, in which case the lessee could not divert or discontinue the business, change the nature of the business, or allow the business to deteriorate as a result of his acts. See, e.g., *Rials v. Davis,* 212 La. 161, 31 So.2d 726 (La. 1947); *Selber Bros., Inc. v. Newstadt's Shoe Stores,* 203 La. 316, 14 So.2d 10 (La.1943). As these cases are distinct from the fact situation before this court, we have relied on the more recent expressions of the Louisiana Supreme Court on this subject.

leased property. The court therein indicated that when the lease is silent as to the intended use of the premises, the circumstances must clearly indicate that only one, specific use was intended for the property in order to find that the initially contemplated use is the exclusive use to which the property can be put. Although the initial use of the property is one factor to be considered, it is not dispositive of the issue, and when the circumstances are, on the whole, ambiguous concerning the intended use of the property, the ambiguity must be resolved in favor of the lessee. The *Tullier* case involved a long-term lease for vacant land upon which a shopping center had been built and operated a number of years. The retail market in the area had deteriorated and several of the major tenants (under sub-leases) had discontinued operations in the center. The buildings had fallen into disrepair after extended vacancies and the tenant, after failing to secure subtenants who would operate retail stores, proposed to renovate the buildings for warehouse use. The property owner opposed this conversion of the buildings to storage areas on the grounds that the intended use for the property was as a shopping center, and that any derogation from this use would be a breach of the lessee's implied obligation to utilize the property according to the use for which it was intended. In analyzing the totality of the situation, the court recognized that the initial intent of the parties was that the property would be operated as a shopping center, and that in fact, the property had been so used for a number of years. The court also noted that a rider to the lease referred to its use as a shopping center, but that the only restriction on use in the lease itself was one prohibiting the use of the property "for any unlawful purpose during the term of the lease." The court also considered the fact that the buildings probably could not ever be leased for shopping center use at that location in the future and that there would be no particular economic advantage to the landowners in the continued use for that purpose, rather than for other purposes. Given all of these facts, the court found that the lease and surrounding circumstances were ambiguous on this issue, commenting:

> Accordingly, where the lease is silent as to the intended use of the premises, we hold that the circumstances must clearly show that the parties intended only a certain use of the property in order for such use to be deemed the exclusively "intended" use within the meaning of Articles 2710 and 2711. Evidence of the contemplated initial use is relevant in this regard, but it is not decisive. Where the silent lease and the surrounding circumstances are ambiguous concerning intended use, this ambiguity must be resolved in favor of the lessee. (Id. at 779)

Despite some factual variations, the *Tullier* case is analogous to the matter before this court and is dispositive. In the present situation, the parties do not seriously contest the fact that the initial use of the premises, as contemplated by both parties, was as a retail department store. However, the lease itself does not specifically limit the use of the premises for this purpose, and allows considerable freedom to the lessee in choosing a subtenant. The only restriction on the subtenant's mode of use prohibits use of the premises as a supermarket, thus implying that all other uses are permitted. Further, Article 33 of the lease gives the tenant the right to determine how its store is to be operated. On the other hand, the lease does contain a percentage rentals clause. As the *Tullier* court noted, such a clause is generally evidence that a retail sales operation is contemplated and is included in the lease to provide the owner with additional economic benefit beyond the flat annual rental. The additional economic benefit can only be derived if the property is used to generate sales volume. However, the evidence in this case shows that the gross sales volume of the Woolco store never reached the point ($7,000,000) at which the percentage rentals became due, and consequently the lessors derived no actual economic benefit from this clause. Additionally, these rent-

als can certainly not be generated from an empty building. These are not circumstances which clearly show that the parties intended only a certain use of the property. *Tullier,* supra. In *Riverside Realty Co. v. National Food Stores of Louisiana, Inc.,* 174 So.2d 229 (La.App. 4th Cir.1965), *cert. den.* 175 So.2d 647 (La.1965), similar economic factors led the court to conclude that the lessee had no obligation to continue its operation of a retail food store on the premises, and could justifiably use the property as a storage center despite the inclusion of a percentage rental clause in the lease there under consideration.

It is also clear from the lease document itself that the defendant anticipated the possibility that its continued operations might for some reason become untenable, as the lease contains several references to the termination of the lessee's business on the premises. Article 5A discusses notice to the landlord of the lessee's intent to cease operations and grants the landlord the option to cancel the lease. Article 33 reserves to the tenant its right to discontinue the operation of any store on the demised premises. These provisions, plus the generally unfettered right to sublease, warrant an inference that the premises could be put to some other use by the lessee or its subtenant. All of these facts suggest a flexibility in the intended use of the leased property which is inconsistent with the plaintiffs' suggestion that the exclusive use of the premises is or should be as a retail department store. Accordingly, to the extent that these factors may be said to leave the issue in an ambiguous state, the ambiguity is resolved in favor of Woolworth, in accord with the clear weight of Louisiana authority. The court concludes this property may be sublet for any other lawful commercial activities.

The second issue before the court is whether the lease requires that payment of the percentage rentals shall be resumed in the event the property is used by the lessee or a subtenant after this intervening period of time during which the lessee has ceased operations on the premises[3]. Article 5A of the lease speaks to this issue, as follows:

> Should the Tenant at any time elect to discontinue the operation of its store, the Tenant shall give to the Landlord notice in writing of its intention so to do and in such event the Landlord shall have one option ... to cancel and terminate this lease....

> Should the Landlord fail to exercise its said option and should the Tenant at any time thereafter discontinue the operation of its said store then and in any such event, anything in this lease to the contrary notwithstanding, it is hereby mutually agreed that the rent which Tenant shall pay to the Landlord during the remainder of the term of this lease shall be the rent more particularly set forth in said Article 5, and the word "minimum" in said Article 5 shall be deemed deleted. Upon the discontinuance of the operation of said store, all of the covenants and provisions contained in the preceding paragraphs of this article shall be of no further force and effect.

The rent to be paid during the remainder of the term, which is set forth in Article 5, is the flat annual rent of $247,586 which the lessee has been paying from the inception of this lease, and continues to pay for the privilege of leasing an empty building. The remaining covenants and provisions of paragraph 5, which are of no further force and effect, deal with accounting and reporting procedures to be observed with reference to the percentage rental. The lan-

---

**3.** An issue arises as to whether this question presents a "case of actual contoversy" within the meaning of the Declaratory Judgment Act, 28 U.S.C. § 2201, since no retail merchant has been put forward as a subtenant. Although not raised by the parties, this is a question which affects jurisdiction and the court concludes that we have an actual controversy on this issue. See e.g. *Maryland Casualty Co. v. Pacific Coal &* *Oil Co.,* 312 U.S. 270, 61 S.Ct. 510, 85 L.Ed. 826 (1941); *Aetna Life Ins. Co. of Hartford v. Haworth,* 300 U.S. 227, 57 S.Ct. 461, 81 L.Ed. 617 (1937); *El Paso Bldg. & Const. Trades Council v. El Paso Chapter Assoc. Gen. Contractors,* 376 F.2d 797 (5th Cir.1967); *Keener Oil & Gas Co. v. Consol. Gas Utilities Corp.,* 190 F.2d 985 (10th Cir.1951).

guage is direct and to the point; it is clear and unambiguous. Percentage rentals shall cease upon the occurrence of certain events, and these shall have no further force and effect.

The evidence before the court shows that in October, 1982, Woolworth gave written notice to the landlords of its intent to discontinue operations, and that the landlords did not exercise the option to cancel the lease within the time allotted for the exercise of this option. Therefore when the store closed, the obligation to pay percentage rentals terminated with it, and this obligation has no future contingent event upon which it can be reactivated; it is of no further force and effect. The lease mandates this result. When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made of them and the clause must be interpreted in accord with its clear meaning. *La.Civ.Code* Art. 2046; *Cashio v. Shoriak*, 481 So.2d 1013 (La. 1986).

Plaintiffs argue that if the clause is interpreted as written, it would potentially allow the absurd consequence of the lessee being allowed to eliminate its obligation to pay percentage rentals merely by temporarily shutting down its operations and then resuming those after the expiration of the time period during which the landlord could exercise the option to cancel the lease. No suggestion has been made that Woolworth closed this store in order to avoid paying percentage rental and the evidence is to the contrary. This store never reached the $7,000,000 threshold and it was closed as a result of a management decision to close all Woolco stores—more than 300. This precise issue was addressed by the Eleventh Circuit when it was called on to interpret identical lease language in a store closing by the F.W. Woolworth Company. The court noted:

> We could imagine situations where a tenant might act in bad faith to cancel a percentage rent clause in a commercial lease. For instance, a lessee could sign a lease at a very favorable rental rate due

to the shopping center owner's desire to secure a solid anchor tenant, and then immediately give notice of its intent to discontinue its operations in order to enter into a profitable sublease of the space. Such a scenario would bother us, but there is absolutely no indication that Woolworth was acting in bad faith on closing its store and subletting in the present case.

*F.W. Woolworth Co. v. Buford-Clairmont Co.*, 769 F.2d 1548, 1555, fn. 9 (11th Cir. 1985). The lease language which eliminated the percentage rentals upon the lessee's cessation of operations must be given its clear meaning, and these rentals, once terminated, are of no further force and effect, even if the lessee or its subtenant or assignee resumes business operations on the premises.

Finally, we must resolve the issue of the scope and extent of the "premises" included in the lessee's right to sublease. The plaintiffs argue that certain language in the lease restricts any sublease to the "demised premises," defined as the department store building only, and that the lessee has no right to sublease any of its rights in the common facilities. The defendant argues that the lease evinces a contrary intent, and that such an interpretation of the lease would truly be an "absurd consequence" which is prohibited by Louisiana Civil Code Article 2046. As plaintiffs suggest, the "demised premises" are defined in Schedule "A" as "a one story building (with land thereunder) containing approximately 103,161 square feet, to be erected within the Entire Premises described below and situated as shown on the drawing attached hereto...." The right to sublease is stated in Article 15 as, "The Tenant is hereby given the right to assign this lease ... and to sublet the demised premises or any part thereof...." Plaintiffs urge that these phrases mean that only the "demised" premises may be subleased, not the common rights in the "Entire" premises. Plaintiffs cite Louisiana Civil Code Article 2725, which states:

The lessee has the right to underlease, or even to cede his lease to another person, unless this power has been expressly interdicted.

The interdiction may be for the whole, or for a part; and this clause is always construed strictly.

The Louisiana jurisprudence has interpreted this article to mean that any clause limiting the lessee's right to sublease must be strictly construed against the lessee. *Bordelon v. Bordelon,* 434 So.2d 633 (La. App.3d Cir.1983); *Serio v. Stewart Investments, Inc.,* 427 So.2d 692 (La.App. 4th Cir.1983) *writ den.* 430 So.2d 97 (La.1983); *Thriftee Oil Co. v. Partin,* 209 So.2d 557 (La.App.2d Cir.1968), *writ den.* 252 La. 255, 210 So.2d 504 (1968).

The strict construction of the sublease clause in this instance must be applied to the entirety of the phrase, in order to ascertain precisely what limitations, if any, were imposed on the lessee's right to sublease. The full text of Article 15 imposes a requirement that the lessee obtain the landlord's approval for any encumbrance or security device which the tenant might put on the property, such as a mortgage, pledge, or assignment of its entire interest. The landlord's approval is not necessary for an assignment of the lessee's interest to a wholly owned subsidiary, nor is it required for a sublease of the property. In any case, the lessee remains bound to all obligations imposed by the lease. The only condition placed upon the lessee's right to sublease prohibits a sublease to a supermarket for as long as another supermarket is open and doing business in the shopping center. This limitation on the tenant's right to sublease is not directed at restricting the scope or extent of the property which can be included in a sublease; rather, it is directed at restricting one particular type of subtenant, in order to avoid conflict with another tenant in the shopping center. Thus, the only "express interdiction" on the lessee's right to sublease is this removal of the lessee's power to sublease to a supermarket. This clause must be strictly construed against the lessee, such that any supermarket operation or

similar activity cannot be conducted by the sublessee on the premises. *La. Civ. Code* Art. 2725.

However, upon close examination of the sublease rights in Article 15, the definition of "demised premises," and other expressions of intent in the lease, the court concludes that no other limitation on the lessee's right to sublease was contemplated by the parties at the confection of the lease. The lease document evidences the intent that the scope of the lessee's interest in the premises is not limited to the department store building, as plaintiffs suggest. First, although "demised premises" is essentially defined in Schedule "A" of the lease as the store building only, other portions of the lease indicate that the "demised premises" include the usual rights of access and all appurtenant easements, including the right to use the common facilities. Article 2 establishes the basic description of the leased property, stating:

The Landlord does demise and let unto the Tenant, and the Tenant does lease and take from the Landlord, for the term and upon the terms and conditions set forth in this lease, a portion of the premises known as

Perkins Road, Baton Rouge, Louisiana ACADIAN VILLAGE SHOPPING CENTER

and more particularly described in Schedule "A" and drawing attached hereto and made a part hereof, together with all alley rights, if any, easements, rights and appurtenances in connection therewith or thereunto belonging, as the "Demised Premises" together with certain non-exclusive common rights in the "Entire Premises" as set forth below.

By its terms, this clause gives to the Tenant, *as part of* the "demised premises," all alley rights, easements, rights and appurtenances which are connected with those premises. Further, in Article 28 of the lease, the tenant is granted "an *easement* throughout the term hereof to use, in common with others entitled to similar use thereof, all of the aforementioned Common

Facilities...." The "easement" granted to the tenant in Article 28 coincides with the "easement" rights referred to in Article 2 as part of the demised premises. The distinction in Article 2 and in Schedule "A" is stated in terms of "demised premises" and "entire premises," but the actual difference to be made by these sections is between the exclusive use and non-exclusive use of certain portions of the shopping center. This tenant has exclusive use of the one building described in the lease. This right differs from the non-exclusive right to use the common facilities, which this tenant shares with other tenants, and also from the use of other stores on the premises, which is not given to this tenant at all, but is reserved for the exclusive use of others. The lease gives the tenant the right to sublease its exclusive use of the demised premises as well as its non-exclusive rights in the use of the common facilities, which appurtane to the demised premises. This interpretation finds support in other portions of the lease. For instance, Article 18, the indemnity section, discusses indemnification to the tenant by the landlord for all claims or demands "arising out of the use of the Common Facilities as defined in this lease, by the Tenant or its licensees." Article 34 states that, "Wherever the word 'licensees' is used in this lease, it is intended that the same shall include subtenants and concessionaires." Clearly, the lease contemplates that licensees, including subtenants, shall have use of the common facilities.

A reading of the lease in its entirety evidences the intent of the parties that the lessee should have the right to sublease its entire interest in the property, including the exclusive right to use the building on the premises, and the non-exclusive rights of access to and use of the common facilities. To interpret the lease otherwise would indeed produce an absurd consequence. If the right to sublease were restricted to the store building only, as suggested by plaintiffs, the defendant would be left in the truly absurd situation of being allowed to sublease a building without being allowed to grant to the sublessee the right to walk upon the sidewalk in front of that building in order to enter it. Nor, under this construction of the lease, could employees or customers of the sublessee use the driveway or the parking lot in order to approach the building. This result was certainly not contemplated by the parties. In a Louisiana case which addressed similar issues, *Trinity Carton Co. v. Falstaff Brewing Corp.*, 261 So.2d 269 (La.App. 4th Cir.1972) *writ den.* 262 La. 457, 263 So.2d 723 (1972), the court reached the same conclusion with reference to a sublease which did not specifically include the alley between two buildings, one of which was subleased. The sublease of that building was predicated on a plan which showed construction of two overhead conveyors to run between the sublessee's own building and the other building, across the alley, which he had subleased. The court refused to enjoin the use of the alley by the sublessee under these circumstances, because to do so would be an "absurd consequence." As the Louisiana Supreme Court recently remarked in the case of *Cashio v. Shoriak*, 481 So.2d 1013, 1015 (La.1986), "When a literal interpretation will produce absurd consequences, the court may consider all pertinent facts and circumstances, including the parties' own conclusion of the instrument's meaning, rather than adhere to a forced meaning of the terms used." Applying this principle to the facts at issue, it is clear the lessee has the right to sublease the demised premises, including access rights and use of the common facilities as described in the lease, to any subtenant except one doing business on the premises as a supermarket or other related food-sales industry.

On the basis of the record, this court declares: First, that the lessee or its sublessee may use the leased premises for the operation of a retail department store, or for any other lawful commercial activity, but may not use the premises as a supermarket or related food-sales operation for as long as one is open and operating at another location within the shopping center; Second, that percentage rentals are

terminated for the duration of the lease term for the lessee or any sublessee of the premises; and Third, that the lessee may sublease its entire interest in the property, including its non-exclusive rights of use in the common facilities at the shopping center.

Judgment will be entered accordingly.