hPEATROSS, Judge.
This action involves a contractual interpretation of a timber agreement, captioned by the parties as a “Timber Sale and Lease,” and a determination of the effect of an untimely annual payment by plaintiff Martin Timber Company (“Martin”). Defendant William T. Pegues (“Pegues”) appeals a trial court judgment awarding Martin an additional 90 days to cut and remove specified timber from the tract of land. Determining the contractual agreement between the parties to effectuate both a lease and a sale and finding the doctrine of judicial control to be applicable, we affirm that portion of the judgment awarding Martin additional time to remove the timber. We reverse that portion of the judgment awarding attorney fees to Pegues.
FACTS
Beginning in 1966, Pegues, a landowner and attorney, began contractual dealings with Martin Timber Company concerning his timber lands in DeSoto Parish. Over the next 16-year period, three contracts were entered between the parties affecting the disputed 245 acres or portions thereof, with the final agreement being executed in 1982. Apart from the implications of these contracts, there was little evidence presented at trial detailing the character of the stand of timber existing on the 245-aere tract from time to time and any actual harvesting of timber by Martin. The trial court did hear the testimony of Pegues regarding his intentions for the agreements and the testimony of Martin’s employee, William F. Weiger, who represented the company in the negotiation of the last critical extension of the-parties’ contract in 1982..
The first contract, which has some implications on the parties’ later dealings, was a timber deed dated December 23, 1966. The deed affected a total of |2200 acres, including 120 acres of the land now in dispute. The deed identified as the subject of the sale specifically selected “pine saw log” trees marked with orange paint at the time of the sale. The deed provided Martin a one-year period to cut and remove the trees. Failure to remove the timber in such time period would cause the timber to “revert to and become the property of’ Pegues.
In July 1972, Pegues and Martin executed a longer term agreement (hereinafter the “1972 Agreement”) affecting the same 200 acres, which had been the subject of the 1966 timber deed, and an additional 200 acres of adjacent Pegues lands. This 1972 Agreement could be extended year-to-year until July 1982. The evidence indicates Pegues provided the wording of the 1972 Agreement for use by the parties; and the 1972 Agreement first employed the language, quoted below, which subsequently was used in the 1982 “Timber Sale and Lease” that has become the subject of this dispute. The 1972 Agreement, which applied to all 245 acres now in dispute, was granted for an initial sum of $31,545 and allowed Martin the year-to-year option of extending the time to cut the timber for ten years by paying annual lease renewal payments of $3.54 per acre. Martin paid every annual lease renewal payment and extended the 1972 Agreement out to the maximum term of the contract which was to end on July 1,1982.
In December 1981, the final year of the 1972 Agreement, Mr. Weiger, on behalf of Martin, contacted Pegues offering to extend the sale and lease agreement for up to an additional 15 years for 245 of the 400 acres covered by the 1972 Agreement. Mr. Weiger stated in a December 21, 1981 letter that Martin was “much interested in continuing the growth on the 245-acre block into larger and more usable raw material.” Testimony at-trial indicated that at the time the 1972 Agreement ended in 1982, 1,000,000 board feet of pine was growing on the tract. hUnder an agreement executed in April 1982 (“1982 Agreement”), Martin paid Pegues an initial payment of $63,000. Like the 1972 Agreement, the 1982 Agreement was divided into two sections, which provided, in pertinent part, as follows:

*730
Sale of Timber

... Seller ... does hereby grant, sell, convey and assign unto Buyer, ...: ■
All of the pine and hardwood timber with a diameter of 10 inches and up at the stump, measured 12 inches above the surface of the ground, and that material which is smaller which must be thinned for the purpose of improving the stand, or growing conditions, growing, standing or lying on the ... [245 acres].
Also there is conveyed unto the Buyer the right to enter upon and occupy the premises with all other rights and privileges thereon necessary or needful for the purpose of - cutting, -harvesting, removing and protecting said timber and timber rights and for the purpose of logging of timber on said land.
* *. * * ‘ *
It is understood that the property and rights herein conveyed represent the fair and reasonable value of the timber hereby conveyed and the right to cut and remove said timber under this sale shall terminate on the 1st day of July, 1983. However, the right to cut and remove said timber may be extended by the payment of annual rentals as hereinafter provided.

Lease Rental Agreement

In addition to the sale of timber and timber rights herein provided for, the parties hereto have and do hereby agree , to the following terms and conditions of a lease agreement (the parties being referred to respectively as Lessor and Lessee hereinafter), to-wit:
Lessor does hereby demise, rent, lease and let unto the Lessee for the purpose of growing, protecting, conserving and harvesting timber from all of the lands herein-above described, subject to the following conditions, to-wit:
(1) Term of Lease. This lease shall terminate as to both parties on the 1st day of July 1983, unless on or before that date | ¿¡Lessee shall pay or tender unto Lessor the amount of Two Thousand Four Hundred Fifty and No/100 ($2,450.00) Dollars, which shall extend and continue the lease in full force and effect for twelve (12) months. In like manner and upon like payments or tenders annually on the 1st day of July, the Lessee may maintain the lease in full force and effect for successive periods of twelve (12) months until the final termination of the lease on the 1st day of July, 1997, subject, however, to the further terms and conditions hereinafter stated. Failure to pay any such delay rental payments annually on or before the due date shall ipso facto and without putting in default terminate all rights of Lessee under this lease contract.
The lease section of the 1982 Agreement also contained provisions requiring Martin to operate on the premises with “high standards of professional forestry management and practice, so as to have, at all times on the lands a growing stand of timber.” In the same provision, Martin was granted “the right to reforest or plant trees on any portion of the land to enhance or increase timber production.”
After contracting the 1982 Agreement, Martin timely paid every lease renewal payment until the July 1, 1995 payment, which was paid late. Pegues accepted and negotiated the draft of the 1995 payment without comment.
In 1996, Martin, through a computer error, missed the annual lease renewal payment due on or before July 1,1996. After Pegues’ attorney informed Martin of the delinquency, Martin tendered the $2450 annual lease renewal payment 16 days late, on July 17, 1996. Pegues refused the payment, claiming that the 1982 Agreement had terminated.
The evidence indicates that, by the time of the dispute, apart from the harvesting of some hardwood and some incidental thinning of pines for poles, the pine timber remained uncut and increased in estimated volume to 1,500,000 board feet.
Martin filed suit seeking to be recognized as the owner of the standing timber until July 1, 1997, or, in the alternative, until expiration of 90 days | sfollowing a final judgment. As a further alternative, in the event that Pegues was declared owner of the timber, Martin sought reimbursement of the *731 $63,000 initial payment and the subsequent lease renewal payments. A preliminary injunction was issued by the trial court prohibiting the cutting of timber during the pen-dency of the suit.
In making its ruling on the interpretation of the contract in favor of Martin, the trial court did not indicate any rebanee on extrinsic evidence in its interpretation of the language of the 1982 Agreement. The court determined that the 1982 Agreement granted rights in the nature of a lease. Accordingly, the court rebed upon the doctrine of judicial control to prevent the dissolution of the lease for Martin’s untimely payment and rendered judgment in favor of Martin ahowing Martin a period of 90 days from the date of judgment to remove the timber from the tract.[1].
On appeal, Pegues argues that the 1982 Agreement was only a sale of standing timber, not a lease, and that, upon the lapse of the stated time for removal of the timber, the ownership of the timber reverted to Pegues. Martin maintains that the 1982 Agreement was not only a sale, but also a lease and that the trial court’s appbcation of the doctrine of judicial control for the extension of the lease was correct.
JeDISCUSSION

Characterization of1982 Agreement

The parties argue as decisive to this dispute whether the 1982 Agreement is a sale or lease or both. We first consider, therefore, the characterization of the parties’ contract.
As stated above, the 1982 Agreement contained a section titled “Sale of Timber” in which Pegues sold to Martin “[a]ll of the pine and hardwood timber with a diameter of 10 inches and up at the stump” and any material which “must be thinned to improve the stand or growing conditions.” Under this section, Martin was given until July 1, 1983, to cut and remove the timber.
As further stated above the next section of the agreement was titled “Lease Rental Agreement,” and provided, in pertinent part:
In addition to the sale of timber and timber rights herein provided for, the parties hereto have and dó hereby agree to the following terms and conditions' of a lease agreement (the parties being referred to respectively as Lessor and Lessee hereinafter), to-wit:
Lessor does hereby demise, rent, lease and let unto the Lessee for the purpose of growing, protecting, conserving and harvesting timber from all of the lands here-inabove described, subject to the following conditions, to-wit:
(1). TERM OF LEASE. This lease shall terminate as to both parties on the 1st day of July 1983, unless on or before that date Lessee shall pay or tender unto Lessor the amount of TWO THOUSAND POUR HUNDRED FIFTY and NO/100 ($2,450.00) DoHars, which shall extend and continue the lease in fub force and effect for twelve (12) months. (Emphasis added.)
La. Civil Code art. 2439, in pertinent part" defines sale as a contract whereby a person transfers ownership of a thing to another for a price in money.
La. Civil Code art. 2669 defines lease as fobows:
Lease or hire is a synallagmatic contract, to which consent alone is sufficient, and by which one party gives to the other the enjoyment of a thing, or his labor, at a fixed price. (Emphasis original.)
RLa. Civil Code art. 2674 provides:
To let out a thing is a contract by which one of the parties binds himself to grant to the other the enjoyment of a thing during a certain time, for a certain stipulated price which the other binds himself to pay.
Ordinarily, when the words to a contract are clear, explicit and lead to no absurd consequences, the meaning and the intent of the parties must be sought within the four *732 comers of the instrument and cannot be explained or contradicted by parol evidence. Bank of Coushatta v. Patrick, 503 So.2d 1061 (La.App. 2d Cir.1987), writ denied, 506 So.2d 1231 (La.1987).
Reading both sections of the 1982 Agreement together, it is apparent the parties contemplated, in 1982, that they were agreeing to both a sale and a one-year lease with 14 annual options to renew the lease for one-year periods.[2] Some of the rights gained by Martin under the lease section may be viewed as accessorial rights of a timber vend-ee, for example, the allowance of ingress and egress upon the vendor’s property for the removal of timber. Other rights gained by Martin under the lease language, as provided by Pegues, however, are not merely accesso-rial: Martin gained the right to “reforest or plant trees on any portion of the land to enhance or increase timber production.”
For these reasons,, we determine that the 1982 Agreement contained two distinct parts, one of which is a sale and the other a lease, and find that effect should be given to both sections.

\sApplicability of Judicial Control

Having found that the 1982 Agreement was, in part, a lease, we now examine whether the circumstances of this ease are appropriate for the exercise of judicial control.
Louisiana law is clear that the dissolution of a lease for non-payment of rent is subject to judicial control according to the circumstances. Edwards v. Standard Oil Co. of Louisiana, 175 La. 720, 144 So. 430 (1932). As this court stated in Ergon, Inc. v. Allen, 593 So.2d 438 (La.App. 2d Cir.1992), under the doctrine of judicial control, Louisiana courts are vested with discretion under certain circumstances to decline to grant a lessor cancellation of a lease although such right appears to be otherwise available to him. See also Lee v. Abernathy, 19 So.2d 670 (La.App. 2d Cir.1944); Tullier v. Tanson Enterprises, Inc., 359 So.2d 654 (La.App. 1st Cir.1978), reversed on other grounds, 367 So.2d 773 (La.1979).
Although La. C.C. art. 2712 would seem to mandate cancellation of a lease upon failure to comply with its terms, cancellation of leases is not favored in Louisiana law. Ergon, Inc. v. Allen, supra; Tullier v. Tanson Enterprises, Inc., supra; Stoltz v. McConnell, 202 So.2d 451 (La.App. 4th Cir. 1967), writ denied, 251 La. 231, 203 So.2d 559 (1967).
Cases which have applied judicial control of leases generally involve circumstances where a lessee has made a good faith error and acted reasonably to correct it. For examples, see Edwards v. Standard Oil Co., supra, (rent was mailed on time, but was late due to faulty mail delivery); Ergon, Inc. v. Allen, supra, (rent of $350 was not paid timely and recission of lease would cost lessee millions of dollars); Atkinson v. Richeson, 393 So.2d 801 (La.App. 2d Cir.1981), (rent was 1915 days late because husband thought wife had paid the rent); Baham v. Faust, 333 So.2d 261 (La.App. 1st Cir.1976), (rent was eight days late and lease provided no place for payment); Housing Authority of the City of Lake Charles v. Minor, 355 So.2d 271 (La.App. 3d Cir.1977), unit denied, 355 So.2d 1323 (La.1978), (rent was paid timely with.third party check from lessee’s employer, but the check was returned for insufficient funds).
The Louisiana Civil Code provides that an obligor who failed to perform may be granted, according to the circumstances, additional time within which to perform. La. C.C. art.2013 and its revision comment (e).[3] See also IP Timberlands Operating Compa *733 ny, Limited v. Denmiss Corporation, 931637 (La.App. 1st Cir. 6/28/95), 657 So.2d 282, in which the court reviewed La. C.C. art. 2729 and noted that “[t]he provision that the judge shall grant no delay in the dissolution of a lease is, in practice, subordinated to the court’s preliminary decision concerning whether a dissolution is appropriate in the first place.”
Pegues, in brief, argues that judicial control is not available in the instant ease because Martin was not an obligor under the 1982 Agreement. We disagree. Under the 1982 Agreement, Martin was obligated to pay the timber purchase price and the initial annual lease payment. The evidence shows the initial payment of $63,000 under the 1982 Agreement was not only to cover the purchase of all timber over ten inches, but also to cover the first payment due under the Agreement for the period of July 1, 1982, to June 30, 1983. In addition, under the 1982 Agreement, Martin was obligated to remove the timber within a specified | iptime and was obligated to make the annual lease renewal payments in order to extend that period of time.
In reaching the decision that judicial control is available under the circumstances of this case, we are cognizant of the holdings of Standard Oil Co. of Louisiana v. Milholland, 167 La. 707, 120 So. 59 (1929), St. Louis Cypress Co. v. Thibodaux, 120 La. 834, 45 So. 742 (1908), and Crowell & Spencer Lumber Co. v. Burns, 191 La. 733, 186 So. 85 (1939), in which the courts refused to grant parties additional time in which to perform. These cases are distinguishable, however, from the instant case.
In Standard Oil Co. of Louisiana, supra, the plaintiff leased from the defendant a certain lot for a period of five years, with the privilege to purchase the property at any time during the life of the lease. Plaintiff/Lessee did not tender the purchase price to the defendant, however, until 16 days after the end of the lease. The court found the tender to have been untimely. The plaintiff/lessee requested the court to extend the time to allow its performance. The court stated:
We have no discretion under the circumstances of this ease to grant plaintiff any additional time. Under the lease plaintiff was not bound to purchase the property, but merely had the privilege of doing so on or before October 31,1927.
In Southport Mill v. Ansley, 160 La. 131, 106 So. 720, we had occasion to review all the articles of our Civil Code relative to the right of courts, in their discretion, to grant or refuse to parties a delay in which to perform certain contracts, and thereby avoid the dissolution of such contracts for nonperformance, to wit, articles R.C.C. 2046, 2047, 2561, 2562, 2563, 2729.
But those provisions relate exclusively to delays to be given a party in default as to something for which he had actually obligated himself, and merely in order to avoid the dissolution of some contract by reason of such default on his part. But in the case before us there is no question of any default on the part of plaintiff. Plaintiff was not bound to purchase the property involved and of course could not be in default for not having done so. It merely had the privilege of buying the property, if it did so before the expiration of the lease; and we know of no law which permits a court to allow a lnparty any additional delay in which to exercise a privilege which he was not bound to take advantage of, but which was granted to him only for a certain time. The cases provided for in the codal articles above mentioned are all cases in which rights actually acquired may (by the grace of the court) be preserved from forfeiture by some, perhaps unfortunate, default.
Id., 120 So. at p. 60.
The circumstances of the instant ease, however, differ from those in Standard Oil, supra. In Standard Oil, the lessee had merely an option to purchase, a privilege completely unrelated to the lease except that the time within which the lessee could exercise the option terminated with the expiration of the lease. The court refused to grant additional time to allow the lessee to exercise this privilege.
In contrast, Martin had, under the 1982 Agreement, more than a mere privilege. As *734 owner of the timber, Martin had a right, directly related to the lease, to remove the timber. The grant of additional time to Martin in the lease would allow Martin time in which to exercise its right to remove what it owns, not additional time in which to exercise a privilege to purchase property in which it has no ownership interest, as was the situation in Standard Oil Co. of Louisiana.
Other significant differences exist between the circumstances in the instant case and circumstances in Standard Oil Co. of Louisiana. The Standard Oil lessee had paid nothing toward the purchase of the property before the expiration of the lease and had no ownership interest in any of the property. The Standard.Oil lessee, therefore, lost no payments and lost nothing it owned at the expiration of the lease. As is more fully discussed below, Martin, however, has made 25 years of payments going toward the lease of the property and purchase of the timber.[4]
|12££ Louis Cypress Co., supra, is similarly distinguishable from the instant case. The contract at issue in St. Louis Cypress Co., supra, conveyed certain timber to the vendee and granted the vendee five years from the date of the sale to cut the timber and to remove the timber from the property. In the first four years and ten months of the time specified in the contract, the vendee failed to remove any trees from the property. Two months prior to the expiration of the five years, the vendee’s request for an extension was denied and the vendee entered the land and, in the words of the court “promiscuously” felled timber in a “hurried and wasteful manner without regard for consequences.”
The St. Louis Cypress Co. court stated that the cutting “was no bona fide attempt to cut the timber for removal, but a desperate expedient to make a showing of partial performance during the closing days of the contract.” Under these circumstances, the court found that, where the contract required both the cutting and removal of the timber to occur within a specified time, any timber not removed from the land would revert to the owner at the expiration of the time period. The court stated that there was “no equity in favor” of the vendee who hurriedly and wastefully cut the timber two months before the expiration of the five years when it was evident that the timber could not be removed within the time limit. The court held that, when a specific time limit was fixed in a timber deed, the vendee was required to remove the timber within the time period or to otherwise forfeit altogether his ownership.
We acknowledge the reversionary rule articulated in St. Louis Cypress Co. We find significant, however, that St. Louis Cypress Co. concerned only a contract of sale, not a lease. Thus, the reversionary rule articulated therein would not govern the instant ease.
| ^Similarly, in Crowell & Spencer Lumber Co. v. Burns, supra, the agreement at issue was a sale which granted the vendee specified timber with a period of 15 years to remove the timber from the land. At the expiration of that time period, the heirs of the vendor claimed title to the timber. The court stated:
... if, in a sale of standing timber, a time limit upon the right of the buyer to remove the timber from the land is fixed in the deed, the title to the timber that is not removed within the time stipulated reverts to the seller, or to his successors or transferees. (Emphasis added.)
Crowell & Spencer Lumber Co. v. Burns, supra at 738-739, 186 So. 85. The court further stated that “this court has never held that where the parties have agreed upon a delay in which to remove the timber, such delay might be extended by the court.” In support of this statement, the Crowell court cited several cases, including St. Louis Cypress Co. Notably, however, Crowell and the cases cited therein, concerned agreements involving sales, rather than lease agreements; therefore, the rule articulated therein would not apply to the Pegues-Martin agreement.
In the instant case, had the parties’ 1982 Agreement merely granted Martin the speci *735 fied timber and until July 1, 1983, to cut and remove it, the reversionary rule of St. Louis Cypress Co. would apply. Since, however, the intention of the parties in 1982, as evidenced by the language of the 1982 Agreement, was to enter into both a sale and a lease, we find the doctrine of judicial control to be available to the court.
As detailed above, the timber relationship between Pegues and Martin spans over 30 years. They first contracted together in a timber deed in 1966. In the 1972 Agreement, the parties contracted for a longer term and Martin timely paid every lease renewal payment, extending it to the maximum term of the contract, July 1, 1982. After contracting the 1982 Agreement, Martin paid every lease renewal | ^payment timely until the July 1, 1995 payment, which was paid late. Pegues accepted and negotiated the draft of the 1995 payment without comment. The next year, as a result of computer error, Martin missed the last lease renewal payment, due July 1, 1996. Martin was informed by Pegues’ attorney of the delinquency on or about July 16,1996, and Martin promptly issued a draft dated July 17, 1996, for the full lease renewal payment. Although the late payment of the previous year had been accepted without comment, Pegues refused to accept the draft for the 1996 payment, which was approximately 16 days late.
Prior to the late payments under the 1982 Agreement, Martin had overpaid the amount due in the annual payments on more than one occasion. Although the amount of set-off due Martin for the overpayments is the subject of dispute, by Pegues’ calculations, Martin is due a credit of $2,035.11. The trial judge found that crediting Martin for this amount left only $217.38 due in the “late” annual payment of July 1, 1996, and further stated that “[s]ueh a small amount delinquent relative to the loss to the plaintiff only bolsters the need for this Court to exercise Judicial Control in preventing the cancellation of this lease.”
The record shows that Pegues received substantial sums from Martin under the 1972 and 1982 Agreements. As previously stated, under the 1972 Agreement, Martin paid an initial price and initial lease payment of $31,-545 and ten years of annual lease renewal payments of $3.54 per acre, subject to specified adjustments. Under the 1982 Agreement, Martin paid an initial price and initial lease payment of $63,000 and 15 years of annual lease renewal payments of $2,450, subject to specified adjustments.[5] In addition, under the 1972 and 1982 Agreements, Martin paid all the ad valorem taxes on the land for the years 1972-1996. As noted above, lifthe evidence indicates that trees existing on the 245-acre tract in 1972 remain unharvested today and the estimated volume of pine timber owned by Martin by the time of this dispute was 1,500,000 board feet. The trial judge found the estimated worth of the timber owned by Martin to be $600,000.
As the preceding paragraph details, the potential loss to Martin is great. Pegues lost the timely receipt of one lease renewal payment, in which he was owed no more than $2,252.49 and probably as little as $217.38. The parties’ history spans 30 years and includes 25 years of payments by Martin under the 1972 and 1982 Agreements. As soon as Martin became aware of its oversight regarding the 1996 payment, it made a good faith attempt to pay the lease renewal payment, tendering payment only 16 days late. As previously stated herein, Louisiana law is clear that the dissolution of a lease for nonpayment of rent is subject to judicial control according to the circumstances. Considering the circumstances in this case, we find that the trial court did not err in exercising judicial control and awarding Martin additional time in which to cut and remove the timber.
CONCLUSION
For these reasons, we affirm the trial court judgment recognizing Martin as the legal owner of the timber in accordance with the agreement at issue. We declare the lease in full force and effect until 90 days from the date of the finality of the judgment in this ease in order to allow Martin time to remove the timber owned by it, with Martin being responsible for all lease renewals accruing during the extended term of the lease. *736 La. C.C.P. art. 2164. That portion of the judgment awarding attorney fees to Pegues is reversed. Costs of this appeal are assessed to Pegues.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
CARAWAY, J., dissents with written reasons.
GASKINS, J., dissents for reasons assigned by CARAWAY, J.

. Additionally, the trial court awarded Pegues $11,000 in attorney fees which, by its answer to this appeal, Martin disputes. Based upon Pe-gues' concession at oral argument that no provision in the parties’ contract or in law allows for the award of attorney fees, we reverse the trial court’s award for attorney fees.

. As stated herein, the evidence indicates that attorney Pegues provided the language used in the 1982 Agreement. La. C.C. art.2056 provides, in part, that in case of doubt that cannot be otherwise resolved, a provision in a contract must be interpreted against the party who furnished its text. While we do not base our decision on the existence of doubt or ambiguity in the contract, we note that any such ambiguity would be construed against Pegues.

. La. C.C. art.2013 revision comment (e) states that whether to grant such additional time is a matter for the court to determine in light of the circumstances of the individual case, including the good faith vel non of the obligor and whether the obligor has a valid excuse for his failure.

. It should be noted that references in this opinion to the 25 payments made by Martin include the 1996 payment which was rejected by Pegues.

. It should be noted that the fifteenth payment was the 1996 payment rejected by Pegues.