967 So.2d 1161 (2007)
Erin GOOD, Dennis L. Good, Jr. and William A. Good, II
v.
Agnes R. SAIA, Augustin Lopez, Earl Williams, Robert Roth, Jr., and Guy Roth.
No. 2007-CA-0145.
Court of Appeal of Louisiana, Fourth Circuit.
September 12, 2007.
*1162 William F. Wessel, Wessel & Associates, A Law Corporation, New Orleans, LA, for Plaintiffs/Appellees.
David J. Halpern, Michael W. Tifft, Halpern & Martin, LLC, Metairie, LA, and David P. Salley, Salley Hite Rivera & Mercer, LLC, New Orleans, LA, for Robert Roth, Jr. and Guy Roth.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge DAVID S. GORBATY).
*1163 JOAN BERNARD ARMSTRONG, Chief Judge.
Plaintiffs, Erin Good, Dennis L. Good, Jr. and William A. Good, II filed suit on May 2, 2006 against their Lessees, Agnes R. Saia[1], Augustin Lopez and Earl Williams, and sublessees/assignees Robert Roth, Jr. and Guy Roth for breach of the lease affecting property located at 8850 Pontchartrain Boulevard in the City of New Orleans. According to the Lease Agreement attached to the petition, the lessee was required to carry liability insurance on the premises naming the lessor and lessee as insureds, and to carry fire, extended coverage, vandalism, malicious mischief and flood insurance in the amount of at least 90% of the $750,000 estimated replacement cost of the premises. The lease also provided that the lessors were to maintain the roof and premises.
The petition alleges that the defendants failed to maintain the insurance required under the lease and failed to maintain the premises, including the roof. It alleges that defendants were responsible for removal of equipment and furnishings that were to remain the lessors' property. The Goods allege that the premises suffered damages in the aftermath of Hurricane Katrina in excess of $400,000 that have not been repaired as required by the terms of the lease. The Goods also seek attorneys fees as provided in the Lease Agreement.
This case was designated Hurricane Litigation on May 2, 2006; however, on May 12, 2006, the trial court removed that designation since it was not an insurance claim.
On May 30, 2006, the Goods filed a Rule for Possession of Premises against the original lessees and Mrs. Saia and against the sublessees/assignees. The Rule cited these defendants' failure to carry the required insurance coverage, and referred to the notices given to these defendants by regular mail on December 12, 2005 and by certified mail, return receipt requested and regular mail on April 7, 2006. A copy of the Lease Agreement was attached to the Rule for Possession.
The record shows personal service of the Petition for Damages for Breach of Lease was made on Agnes Saia on May 25, 2006; personal service on Augustin Lopez on May 24, 2006; and personal service on Earl Williams on July 7, 2006.
Mr. Lopez filed a general denial on June 9, 2006. Mrs. Saia filed a peremptory exception of no cause of action on June 26, 2006. On July 13, 2006, Augustin Lopez and Earl Williams adopted Mrs. Saia's exception. The Roths filed an answer and affirmative defenses of "equity, estoppel and cure," and a reconventional demand against the Goods asserting breach of the lessors' warranty of peaceable possession and seeking damages, punitive damages, attorneys fees, court costs and legal interest, and a declaratory judgment decreeing that the Roths have a leasehold interest through 2012.
The record shows personal service of the Rule for Possession of Premises was made on Augustin Lopez on June 6, 2006 and on Agnes Saia on June 6, 2006; domiciliary service was made on Earl Williams through his wife on June 7, 2006. Counsel for the Roths by letter dated July 14, 2006, accepted service of the Rule to Show Cause Why Possession of the Premises Should Not Be Delivered.
The trial court granted the Exception of No Cause of Action filed on behalf of Mrs. *1164 Saia, Mr. Lopez and Mr. Williams, and granted the Goods leave to amend their Petition for Damages and Breach of Lease.
On July 24, 2006, the Goods filed a first Amended Petition for Damages and Breach of Lease, asserting their ownership and designating the relationship of the parties as follows:
Defendants Lopez and Williams are original lessees of the subject property, and defendant Saia is obligated to the terms of the lease by having succeeded to her deceased husband's estate.
The original lease was for a period from August 1, 1976 to August 1, 1986, with five options to extend the lease for five years successively.
On September 7, 1978, the lessees exercised their right under the lease to assign the lease to Windjammer, Inc.
On December 4, 1985, Windjammer, Inc. exercised a renewal option extending the lease to August 1, 1991.
On August 15, 1990, Windjammer, Inc. exercised a second renewal option.
On November 14, 1995, Windjammer, Inc. exercised a third renewal option.
On February 5, 1997, Windjammer, Inc. assigned the lease to the Roths.
On March 25, 2001, the Roths exercised a fourth renewal option.
On May 23, 2002, the Roths exercised a fifth renewal option.
Following a hearing on the Rule for Possession of Premises filed on behalf of the plaintiffs against Ms. Saia, Mr. Lopez, Mr. Williams and the Roths, the trial court make the rule absolute as against Ms. Saia, Mr. Lopez and Mr. Williams ordering them to surrender the premises to the Goods. That judgment is final and has not been appealed. The court continued the rule as to the Roths.
On August 8, 2006, the Roths filed exceptions of insufficiency of citation and service of process, improper cumulation, unauthorized use of summary proceeding, non-joinder of a necessary party, an answer, and affirmative defenses of equity, estoppel and cure to the Rule for Possession. Attached to the exceptions and answer is a copy of the assignment dated September 7, 1978 from Mr. Saia, Mr. Lopez and Mr. Williams to Windjammer, Inc.; of the sale of movable property and assignment of lease dated February 5, 1997 from Windjammer, Inc. to the Roths, and a copy of a flood insurance declaration page showing coverage in the amount of $200,000 on the building and $50,000 on its contents, effective as new business from December 11, 2005 to December 11, 2006. Also attached is a certificate of insurance that does not indicate the amount of coverage or the type of coverage, nor a description of the property insured. The record does not contain any allegation or documentation tending to show that the Roths have any right to possession of the premises save as assignees/sublessees of the leasehold interest that came to them through the original lessors, their heirs and assigns.
On August 22, 2006, Ms. Saia filed her answer to the Goods' First Amended Petition for Damages and Breach of Lease. On August 24, 2006, Mr. Lopez and Mr. Williams filed their answer to the amended petition.
On September 26, 2006, the Roths filed an Exception of No Cause of Right of Action to the Goods' Rule for Possession, asserting that the Goods waived the various breaches of the lease agreement and forgave the infractions.
The trial court heard the Rule for Possession as to the Roths and allowed the parties to file post-trial memoranda. On November 21, 2006, the trial court granted the Goods' Rule for Possession and entered extensive Reasons for Judgment. *1165 The Roths instituted the instant appeal from that judgment.
On November 21, 2006, the Roths filed a Motion and Order for Article 4135[sic] Suspensive Appeal." It appears that the Roths sought to appeal pursuant to La.C.Civ.Pro. art. 4735, which provides:
An appeal does not suspend execution of a judgment of eviction unless the defendant has answered the rule under oath, pleading an affirmative defense entitling him to retain possession of the premises, and the appeal has been applied for and the appeal bond filed within twenty-four hours after the rendition of the judgment of eviction. The amount of the suspensive appeal bond shall be determined by the court in an amount sufficient to protect the appellee against all such damage as he may sustain as a result of the appeal.
The Motion and Order sets a bond of $7500, indicates receipt from the Roths' counsel of $2,766.19 and contains no return date. We note from the record that as of December of 2006, the rental arrearages totaled $13,830, and the insurance policies obtained by the Roths on the property expired in November of 2006 and May 2007. In light of these facts, the appeal bond is clearly insufficient within the meaning of La.C.Civ.Pro. art. 4735.[2]
On December 1, 2006, the Goods filed a Motion to Dismiss Appeal. The appeal was lodged on February 2, 2007. Therefore, the motion is timely. La.C.Civ. Pro. art. 2161. Appeals are favored, and any ambiguity or doubt should be resolved in favor of maintaining the appeal. Heim v. Chevron U.S.A., Inc., 593 So.2d 727 (La.App. 4 Cir.1992).
The record contains only the original "Motion and Order for Article 4135[sic] Appeal"; however, the record contains an Opposition to Motion and Order for Amended Article 4735 Suspensive Appeal[3], which opposition was filed on behalf of the Goods. In their opposition, the Goods note that the trial court's jurisdiction ended upon the filing of the original notice of appeal, and that La.C.Civ.Pro. art. 2088 does not include provision for the retention of jurisdiction to address an Amended Motion for Article 4735 Suspensive Appeal. Indeed, such a construction would be contrary to the clear intention of La.C.Civ. Pro. art. 4735 to provide a window of only 24 hours within which to perfect a suspensive appeal of a judgment of eviction. The opposition notes that apparently the Roths relied on La.R.S. 13:4433 as supportive of their amendment. That statute provides:
Whenever an appellant files an incomplete transcript, or files the transcript or a further application for an extension, within three judicial days after the return day, or omits to file as part of the record any transcript exhibits offered in evidence, or whenever because of any error on the part of the clerk of court or of the trial judge, or for any purely technical reason, a motion to dismiss his appeal is filed either by an appellee, third person or intervenor, charging and setting forth as grounds for dismissal any of the above reasons, no appellate court shall maintain said motion to dismiss, or dismiss the appeal, unless it first allow to the appellant at least two additional days, exclusive of Sundays and holidays, to cure and correct any and all the informalities and irregularities alleged and complained of in the motion to dismiss. Such appellant, before *1166 the date on which the motion to dismiss is fixed for trial, may cure and correct any objection, irregularity or informality charged or alleged to exist in the motion to dismiss, and if it appears to the appellate court that he has done so, the motion to dismiss shall be denied. [Emphasis supplied.]
We note that the opposition refers to the failure to provide a return date as substantive, and not "purely technical" within the meaning of the statute. See State ex rel. Connelly v. Scruto, 128 La. 960, 55 So. 590 (1911) and Salles v. Jacquet, 106 La. 643, 31 So. 153 (1901). We note that these cases predate the adoption of our Code of Civil Procedure, including La.C.Civ.Pro. art. 2125, which provides:
The return day of the appeal shall be thirty days from the date estimated costs are paid if there is no testimony to be transcribed and lodged with the record . . ., unless the trial judge fixes a lesser period. The trial court may grant only one extension of the return day and such extension shall not be more than thirty days. A copy of the extension shall be filed with the appellate court. Subsequent extensions of the return day may be granted by the appellate court for sufficient cause. . . .
While not condoning the absence of a return date in the instant case, we cannot say that this absence constituted a substantive rather than a purely technical defect.
The Roths rely on State v. Camp, 326 So.2d 644 (La.App. 2 Cir.1975) for the proposition that the duty of timely fixing the return date rests with the trial court pursuant to La.C.Civ.Pro. art. 2125, so that failure of the court should not prejudice the appellant. However, it does not appear that this circuit has adopted that interpretation of article 2125. It also appears from the record that the original Motion and Order for Appeal in the instant case was prepared and filed by counsel for the Roths, so that the absence of a return date clearly is imputable to the appellants.
While not grounds for dismissing the appeal, we find that the amendments to the bond and to the return date are contrary to the very narrow window allowed for perfecting a suspensive appeal from a judgment of eviction. In light of the specific provision of La.C.Civ.Pro. art. 4735 requiring that this particular type of appeal must be applied for and bond set within twenty-four hours of the judgment of eviction, we are compelled to conclude that this purportedly suspensive appeal should be converted to a devolutive appeal.[4] For the foregoing reasons, we deny the Goods' Motion to Dismiss Appeal, but convert this appeal to a devolutive appeal.
In reviewing the factual findings of a trial court, an appellate court is limited to a determination of manifest error. Hill v. Morehouse Parish Police Jury, 95-1100 (La.1/16/96), p. 4, 666 So.2d 612, 614; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). It is well settled that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong," and where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Where there are two *1167 permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo. When findings are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings; for only the fact finder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in what is said. Where documents or objective evidence so contradict a witness's story, or the story itself is so internally inconsistent or implausible on its face, that a reasonable fact finder would not credit the witness's story, the court of appeal may well find manifest error or clear wrongness even in a finding purportedly based upon a credibility determination. But where such factors are not present, and a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Rosell v. ESCO, 549 So.2d 840, 844-845 (La.1989).
In affirming the trial court's judgment, we have reviewed and considered the entirety of the record on appeal, and determined that this record, taken as a whole, adequately supports the judgment on the Rule for Possession in favor of the Goods.
Robert Roth and William Good testified at the hearing in the trial court on the Rule for Possession.
Mr. Roth testified under cross-examination that he is currently occupying the premises at 8550 Pontchartrain Boulevard by reason of a Sale and Assignment of an original Lease between the Goods and Salvador Saia, August Lopez and Earl Williams. Mr. Roth admitted that he had never negotiated or entered into a lease agreement with the Goods. His only contact with the Goods was when he exercised a renewal option under the terms of the original lease. He also admitted having subleased the premises to Voodoo Barbecue, of which he believed Alton Doody, Jr. was the managing member. He claimed that at the time he entered into this sublease, he required Voodoo Barbecue to abide by the terms of the original lease, including the agreement to furnish and maintain insurance, flood insurance, building insurance and liability insurance. When asked if he had insurance on the premises from January to November of 2005, Mr. Roth at first said all of his paperwork was flooded in his office on Harrison Avenue. Under further cross-examination, Mr. Roth testified that "as far as [he] was concerned", there was insurance. However, he admitted he has investigated and been unable to discover the alleged insurer(s) or agent(s), and admitted further that he could not remember having given the Goods a certificate of insurance in 2005 for the premises.
According to Mr. Roth, following the hurricane, Voodoo Barbecue's representative told him that the lakefront location was treated separately from his three other locations, and asked what he could do to help to fix the situation. The trial court found that this was an indication that there was no insurance coverage, since, had such coverage been in place, there would have been nothing to "fix."
Under further cross-examination, Mr. Roth was confronted with a copy of his verified petition in his suit against Voodoo Barbecue, et al, bearing No. 06392 on the docket of the Civil District Court for the Parish of Orleans. He admitted having sworn before notary public Michael Tift to the truth and correctness of the petition's allegations. Mr. Roth then read Paragraph 3 of the petition:

*1168 Under the Lease Agreement and general lease law, Voodoo Barbecue, L.L.C. is obligated to pay rent, taxes and utilities; assume responsibility for repair, maintenance; surrender the premise in like condition; carry flood, liability, and property insurance[5]; and rebuild and restore the premises in the event of a casualty.
Mr. Roth testified that Voodoo provided the required insurance effective July 1, 2002 and continuously thereafter; however, he could not recall the name of the insurer or the insurance agency, claiming that all certificates of insurance were destroyed when his office flooded. He also claimed at this point in his testimony to have sent copies of the certificates of insurance to the Goods, having previously admitted that he did not recall having sent a 2005 certificate to the Goods.
The cross-examination continued, and Mr. Roth admitted that his sworn petition also alleged that Voodoo Barbecue failed to maintain the roof of the premises, failed adequately to secure the premises prior to the hurricane, and, in Paragraph 9 noted Voodoo Barbecue's lease obligation to carry liability, fire, extended coverage, vandalism, malicious mischief, flood and general hazard insurance on the premises. Mr. Roth then read Paragraph 10:
On information and belief, Voodoo Barbecue, L.L.C. has defaulted on its agreement to carry all of the aforesaid insurance coverage for which general and special damages are pled.
Mr. Roth was then asked to identify the information on which he based the belief that Voodoo Barbecue defaulted on the insurance obligation. Mr. Roth testified that he was unable to obtain information from Mr. Doody as to whether Voodoo Barbecue had procured insurance for the premises. Mr. Roth admitted that he did not obtain such insurance until November of 2005, when he procured a three-month binder for a $500,000 commercial liability insurance policy including $425,000 building coverage (with 80% coinsurance) and a one-year, $150,000 building/$50,000 contents flood policy[6]. Mr. Roth testified that he obtained a second three-month policy, expiring in May of 2006. The Roths then opened their own restaurant in the premises and obtained a policy effective from May 2, 2006 to May 2, 2007 on the property. Mr. Roth initially claimed that he gave the insurance policies to the Goods, but the trial court noted that he had furnished copies only of the applications. While Mr. Roth testified, once again "as far as [he is] concerned", that he received a declaration page indicating insurance in May of 2005, he admitted that his verified petition in the suit against Voodoo Barbecue alleges to the contrary.
Mr. Roth's identification of the demand letters[7] sent to Mr. Roth, Ms. Saia, Mr. Williams and Mr. Lopez on December 12, 2005 and on April 7, 2006 on behalf of the Goods led to a very illuminating colloquy:
Q: Mr. Roth, I'm going to show you what I've marked for identification as Exhibit No. 8, which was a letter addressed to Saia, Lopez, Williams, and yourself on December 12, 2005. You  you received that, right?
A: Yes.
Q: Okay.

*1169 A: Well, 
Q: And I'm going to show you Good No. 9, which is dated 
A: I remember reading 
Q: April 7th.
A I remember reading this, but I don't know whether I got it or it was to my attorney, I'm not sure.
Q: It's addressed to you at the  at your restaurant, correct, on Poydras Street?
A: Well, that restaurant is closed too, but 
Q: Was it closed in December of '05?
A: No, but 
Q: All right.
A:  this is the wrong address.
Q: This is 
A: It's 610 Poydras, 
Q: Well, 
A:  in the Whitney Hotel; this says 601.
Q: All right. And did you receive the letter 
A: I did not receive that.
Q: Oh, now, you did not receive this letter 
A: Right.
Q:  just out right?
A: Because I never received anything at 610 Poydras.
Q: Okay. And the Good No. 9, the letter directed on April 7, 2006 to you, you did not receive that either then at 610 Poydras?
A: No.
Q: Okay. What  do you recall in response to the December 12th letter having a meeting with Mr. William Good and me, and your attorney at my office?
A: Yes, sir.
Q: Okay, but you did not receive either one of the letters?
A: I didn't receive that at 610 Poydras, no.
Q: Okay.
A: I never received any 
Q: Well, where did you receive it?
A: I didn't receive anything at 610 Poydras.
Mr. Roth testified on direct examination that he purchased the Windjammer business and lease in 1997, to operate the Breakwater restaurant. He sent rental payments to Erin Good and dealt with her with respect to the property. He subsequently subleased the property in June of 2002 to Voodoo Barbecue L.L.C. Voodoo Barbecue made rent payments to Mr. Roth, and Mr. Roth sent his rent payments to Ms. Good. It was his practice to require Voodoo Barbecue to provide proof of insurance, which he would pick up from the restaurant and file in his records at his office on Harrison Avenue. As to provision of proof of insurance to the Goods, Mr. Roth gave the following testimony:
Q: Do you know if it was the normal course of your business, you would provide copies of any evidence of insurance to anybody?
A: I did, I know recently. And then before 
Q: Prior to the storm, I'm sorry.
A: Prior to the storm? I would remember, and Mr. Good showed me a policy that I had given him.
Q: What was the date of 
A: But I was never asked for a policy.
Q: You  you would provide it?
A: Yes. I would always do it, but never was asked. I just 
Q: Why?
A: I just mailed the rent check every month since 1997 and that was sufficient 
Q: Okay.
A:  along with insurance when they asked, but I was never asked.

*1170 Q: Were you ever asked?
A: No.
It appears unclear from Mr. Roth's testimony whether he ever provided proofs of insurance, since his testimony was that he always provided it when asked, but he was never asked. Mr. Roth testified that in May or June of 2005 he received a certificate of insurance from Voodoo Barbecue, and asked his secretary to mail a copy to the Goods, but he had no memory of the identity of the insurer or insurance agent. Nor was he able to obtain this information from Voodoo Barbecue's manager.
Mr. Roth testified that he made some of the repairs noted in the Gurtler report, but admitted that he did not gut the interior or remove any but a few test sections of sheetrock. He also admitted that he had not obtained an air quality test prior to opening the restaurant. On re-cross examination, Mr. Roth admitted that he did not remove the beaded board that had been installed over sheetrock to determine whether the underlying sheetrock was wet or moldy, and did not replace the wiring for the lower interior electrical outlets that had been submerged in floodwaters.
On re-cross examination, Mr. Roth again testified that he saw a declaration of insurance covering several Voodoo Barbecue locations in May or June of 2005. When asked what coverages were contained in this declaration, Mr. Roth replied, "The coverages that we had to have in the lease." When asked if he knew what those were, he replied, "I don't recall." Counsel then pressed Mr. Roth to testify if he recalled the specific coverages required under the lease, asking him if he could tell whether or not they were contained in the proof of insurance certificate. Mr. Roth replied, "I can't answer it, but I'll  I'll tell you that we made them have more insurance than what was required by the lease, because in the lease it was lower."
Mr. Roth testified that in his final conversation with Mr. Doody, Voodoo Barbecue's manager, Mr. Doody said that he was not coming back and suggested he return the property to the landlord. Mr. Roth admitted on re-cross examination that he is suing Voodoo Barbecue and Mr. Doody for rent and for the money spent on repairs to the premises. Included in the Roths' lawsuit is the claim that Voodoo Barbecue did not insure the property. Clearly, that position is contradicted by Mr. Roth's sworn testimony in the instant case that he saw the certificate of insurance, that it complied with all the lease requirements, and that he had his secretary send a copy of it to Ms. Good.
Mr. Roth also admitted on re-cross examination that, as to the new insurance coverage he procured after the storm, he has not complied with the requirement contained in Paragraph 14 of the lease that he provide a copy of the entire policy of insurance thirty days prior to the expiration of the policy previously in effect. There is nothing in the certificate to show coverage for vandalism and malicious mischief as required by the lease agreement.
Finally, on re-cross examination, Mr. Roth denied any knowledge of the judgment evicting the original lessees from the premises, although that judgment had been discussed during the course of the trial testimony that day.
Mr. Good testified that he and his two first cousins, Erin Good Crockett and Dennis Good, are the owners of the subject property, which they acquired by a 1992 Judgment in the matter of the Good Testamentary Trust. He denied having entered into any lease agreement directly with the Roths. He testified that he was asked to release the original lessees and take the sublessees as responsible parties, but denied the request on the advice of counsel and of his father.
*1171 He testified that he is a real estate developer and works in construction. He built a prison in North Louisiana, a restaurant in Jackson, Mississippi and a carwash in New Orleans. He also held a distributorship for a concrete product used in these projects. He also has some residential construction experience, having build a carriage house in the French Quarter and a bookstore in uptown New Orleans. He testified that he is acquainted with how to determine the work required to be done to repair a building.
Mr. Good categorically denied having received copies of insurance policies covering the property, thus contradicting Mr. Roth's testimony. Mr. Good further testified that although after Hurricane Katrina he asked Mr. Roth to provide proof of insurance coverage for the period during which the hurricane struck, Mr. Roth did not do so. Neither would Mr. Roth furnish the name of the alleged insurance carrier or insurance agent.
After the hurricane, Mr. Good inspected the premises with a representative of the Gurtler engineering firm and found that the highest water mark was between two and a half and three feet high, and there was mold throughout. He noticed that none of the moldy sheetrock had been removed. He engaged J.W. Drennan Construction, a firm with which he is affiliated, to estimate the cost to repair the interior. He estimated this cost at $153,000.
On cross-examination, Mr. Good testified that Mr. Roth executed the last two five-year options extending the original lease, and that after 1997, he had no further direct dealings with the original lessees. Mr. Roth paid the monthly rental charges. He identified the assignment of the lease executed in 1978 from Saia, Lopez and Williams to Windjammer, Inc., and the 1997 assignment from Windjammer, Inc. to the Roths.
As to insurance, while the lease required only $50,000 liability coverage, it required 90% of value for property damage coverage.[8] Mr. Good testified that he and his cousins did not seek to increase the liability coverage requirement. He testified that his cousin Erin Good collected the rent and kept copies of the insurance declarations. He testified to his belief that in 2004 or 2005 they did not receive proof of insurance, and that it was probably correct that neither he nor his cousins pursued that issue with the lessees.
Mr. Good testified that he provided a copy of the Gurtler report to the Roths, and that the completion of the repairs outlined in that report would satisfy him as to the Roths' repair obligation under the lease assignment. The Roths did not allow him to inspect their repairs to the building, nor did they give him information concerning their efforts, if any, to ameliorate the air quality and other issues referenced in the Gurtler report.
The Roths continued to pay rent to the Goods after the hurricane, but the Goods did not accept payments from and after August of 2006, when the trial court entered judgment against the primary lessees evicting them from the premises. Mr. Good testified further that he did not receive proof of the post-Katrina insurance until September of 2006, about a month before the trial of the rule against the Roths, and proof of the November 2005 flood insurance policy until May of 2006. He still has not received proof of coverage for the Katrina-related losses.
At the conclusion of Mr. Roth's testimony, the trial court made the following observations *1172 to counsel concerning the witness's credibility:
I'm going to be honest with you, . . ., I know your  your client has tried to muddy the waters. He  he whether he realizes it, he's been inconsistent in his testimony. I mean, his caginess has made him inconsistent. I don't believe there was a policy in effect. There is a breach of the contract.
In extensive and considered reasons for judgment, the trial court made certain findings of fact. The court noted that the original lessees leased the premises until September 7, 1978 at which time they assigned the lease to Windjammer, Inc. On December 4, 1985, Windjammer exercised the first of five five-year options to renew the lease, extending it through August 1, 1991. The company subsequently exercised a second option on August 15, 1990, extending the lease through August 1, 1996. It exercised a third option on November 14, 1995, extending the lease through august 1, 2001. Windjammer then assigned the lease to the Roths on or about February 5, 1997. The Roths exercised fourth and fifth options to renew, extending the lease through August 1, 2011, and either assigned the lease or sub-let the premises to Voodoo Barbecue L.L.C. during the course of these transactions. It is undisputed that at the time of the alleged breach of the lease, Voodoo Barbecue was in possession and control of the leased premises by permission of the Roths. Those findings are completely supported by the record.
The trial court then noted that the alleged breach was discovered as a result of Hurricanes Katrina and Rita. The leased premises apparently were damaged as a result of the hurricanes and when the plaintiffs inquired as to who was the liability insurance carrier they were met with uncertainty. After various unsuccessful attempts at obtaining the policy number and name of the alleged property liability insurance carrier, the plaintiffs executed and forwarded a letter of default on the original lessees and the Roths on December 12, 2005. Having received no satisfactory proof of insurance, the plaintiffs then executed and forwarded a notice of eviction by certified mail in April, 2006. This action was followed by the filing of a Petition for Damages and Breach of Lease and a Rule for Possession. These findings are completely supported by the record.
The trial court correctly noted that Louisiana jurisprudence does not favor the cancellation of otherwise valid lease agreements. A lease will be dissolved only when it has been shown that the lessor is undoubtedly entitled to the cancellation. Atkinson v. Richeson, 393 So.2d 801, 803 (La.App. 2 Cir.1981).
In their first assignment of error, the Roths contend that the trial court failed to find that the lapsed insurance coverage was cured by their provision of forward coverage within the 30-day cure period provided in the lease agreement. The Roths rely on Robert Roth's testimony that he first learned of the lack of coverage in September or October of 2005, and immediately obtained coverage. However, the trial court specifically rejected Mr. Roth's testimony as unworthy of belief. Furthermore, the Roths appear to have taken the position at various times during the course of this litigation that (a) there was pre-Katrina insurance coverage on the premises; and (b) Mr. Roth had seen evidence of this coverage and had his secretary send it to Ms. Good. However, had this been the case, the Voodoo Barbecue owner would not have asked Mr. Roth, as Mr. Roth testified, what the owner could do to "fix" the problem. As the trial court noted, with insurance, there would have been nothing to "fix." This position is at variance with Mr. Roth's own actions, *1173 for it contradicts common sense "immediately" to purchase very costly insurance coverage if one believes there is insurance in place. Furthermore, it is highly unlikely that experienced businessmen like the Roths would have expended what Mr. Roth described as a substantial sum on repairs had he believed that those repairs were covered by insurance. The record clearly supports the trial court's finding that the Goods proved the absence of insurance coverage at the most relevant time, the advent of Hurricane Katrina.
The lease required the lessee not only to carry liability and property damage insurance, including fire, extended coverage, vandalism, malicious mischief and flood, but also to deliver a copy of the policy, not merely a certificate of insurance, an application for insurance, or a binder for insurance, thirty days prior to the expiration of the policy then in effect. The demand letter of December 12, 2005 allowed the Roths thirty days to provide the policies called for in the lease. Since there were no policies for the period from the expiration of the last valid policy to the date of the letter, the default was insusceptible of cure. The acquisition of post-Katrina coverage could not in any way cure the default occasioned by the lack of coverage when the catastrophic loss occurred. We note also the lack of any evidence that the Roths provided the Goods with copies of the policies they claim were issued pursuant to the applications. This also constitutes a continuing default of their obligations under the lease agreement.
The trial court's conclusion that Mr. Roth's testimony was inconsistent is supported by the record. As the trial court noted in its reasons for judgment:
The most damaging testimony, however, came from Mr. Robert Roth, Jr. himself. Mr. Roth testified that he saw a policy purchased by Voodoo Barbecue covering the property in question He asserted that this policy covered several of the Voodoo Barbecue locations, including the premises, which are the subject of this suit.
Mr. Roth further testified that he had several follow-up conversations with the owner of the Voodoo Barbecue housed at the location in question and that those conversations never resulted in confirmation of the existence of "current" insurance coverage. In fact, Mr. Roth stated that during this last conversation with the Voodoo owner, which took place while the Voodoo was removing its refrigerators and other equipment, the owner asked him "what did he want him to do to fix it."
There was no evidence submitted by the defendant that there was any insurance information forthcoming from Voodoo following this conversation. In fact, not long after this incident Mr. Roth proceeded to procure insurance on the premises at what he characterized as a "very high price." Clearly he would not have rushed out to procure insurance at a "very high price" if there was in fact coverage already in place.
Further, . . . the location in question is still under repair, not with the use of insurance money, but with funds provided by Mr. Roth.
Though the defendant continues to argue that the plaintiff's [sic] failed to meet their burden, this Court disagrees. The plaintiffs requested proof of insurance from the defendants and the defendants failed to produce same. At that time, the burden shifted to the defendants to prove that insurance was in fact in place. The defendant failed to make this showing.
We note that although Mr. Roth testified that he sent proofs of insurance to Ms. Erin Good, and that his own records of same had been destroyed by floodwaters, *1174 he did not subpoena Ms. Good to corroborate his testimony.
The trial court also noted in the reasons for judgment that while this Voodoo Barbecue location was damaged in the aftermath of the hurricanes, at least two other Voodoo Barbecue locations in the New Orleans metropolitan area re-opened and are operating normally. The trial court cogently observed:
Thus, if the policy covered these locations, as suggested by Mr. Roth, then there certainly should be some information at the other locations as to who is/was the insurance carrier. Yet, the record is void of any efforts made by the defendants on this issue.
In light of this State's broad and liberal discovery procedures, and the pendency of not only the instant suit, but also the above-referenced litigation commenced by the Roths against Voodoo Barbecue, L.L.C. and its managers, it seems clear that the Roths had available means by which to confirm the existence of the insurance at issue and to discover the identity of the insurer.
The record taken as a whole amply supports the trial court's conclusion that the Roths violated the terms of the lease agreement by having failed to maintain insurance on the leased premises.
The Roths rely on this Court's opinion in Chevalier v. Duvigneaud, 292 So.2d 779 (La.App. 4 Cir.1974); however, we do not find that the cited case supports the Roths' position. In that case, the lease agreement provided for a fifteen day cure period for lease defaults. The lessor sent a certified letter to the lessee advising of the following defaults: (1) non-payment of rent; (2) unlawful or injurious use of property; and (3) evidence of current insurance. The lessee replied that he was attempting to provide insurance and would continue his efforts to do so. He asked for assistance and additional time in this effort, which the lessor denied. The lessor then filed a rule for eviction, which the trial court granted. This Court affirmed, finding evidence that the parties intended that the property be insured by the lessee. We rejected the lessee's estoppel defense based on the lessor's failure over a five year period to require proof of insurance. The lessee's inability to obtain insurance did not alter the contractual requirement to do so. The Roths rely on the language in the opinion noting that had the lessee furnished evidence of insurance coverage within the cure period, the lease could not have been cancelled. In this case, had the Roths provided evidence that the property had been properly insured, there would have been no breach. This they did not do.
In their third[9] assignment of error, the Roths contend that the trial court erred in finding that the lapse in insurance coverage was a substantial breach meriting eviction, citing La.C.C. art. 2014 and judicial control of leases. La.C.C. art. 2014 provides:
A contract may not be dissolved when the obligor has rendered a substantial part of the performance and the part not rendered does not substantially impair the interest of the obligee.
The Roths contend that the lack of insurance coverage when the hurricane struck was not a substantial breach of the lease, and that the Goods have suffered no harm because of the Roths' repairs to the premises The evidence is clear that while the Roths made certain repairs and provided forward insurance coverage, those repairs did not remedy all of the damage referred to in the Gurtler report. Mr. Roth admitted in his testimony that he did *1175 not remove the beaded board covering the sheetrock and that he did not remove the sheetrock. He offered no evidence that he performed a mold remediation. On the facts, we do not find the trial court's conclusion that the breach of the lease was substantial and unremediated is manifestly erroneous or clearly wrong.
The Roths cite this Court's recent opinion in Karno v. Bourbon Burlesque Club, Inc., 05-0241 (La.App. 4 Cir. 5/10/06), 931 So.2d 1111 in support of their position that they had complied substantially with the lease. In that case, we held that La.C.C. art. 2014 sets up two criteria for preventing dissolution of a breached lease: (1) substantial performance by the obligor (in this case the Roths), and (2) no substantial impairment of the interest of the obligee (in this case the Goods). Provision of insurance after-the-fact of a catastrophic loss cannot be said to constitute substantial performance. Nor does a cosmetic repair of the premises, which repair does not comply with the Gurtler report, ameliorate the substantial damage to the Goods' interest in the leased premises.
In the Karno case, the lessor asserted as a breach of the lease a number of New Orleans Health Department and fire regulations. Only the lessor had received notice of the violations, and it appeared before the Administrative Adjudication Bureau and pled no contest to the violations. The lease agreement provided for a ten day cure period; however, in light of the fact that the improvements needed to comply with the Health Department regulations would require approval by the Vieux Carre Commission, remediation within the cure period would be impossible. The major holding, however, was that the breach was not major. In determining whether a breach of a regulation is a substantial or material violation of a law or ordinance, this Court applied the reasonable person standard. Significantly, the opinion distinguishes the Karno facts from those of Select Properties, Ltd. v. Rando, 453 So.2d 980 (La.App. 4 Cir.1984), noting:
Nor does the breach in the instant case affect the plaintiffs' interest to the extent that the failure of the lessee to obtain required insurance did in Select Properties, Ltd. v. Rando, 453 So.2d 980 (La.App. 4 Cir.1984). Insurance requirements are intended to protect the lessor's interests from exposure to substantial loss.
05-0241, p. 7, 931 So.2d at 1116.
This Court in Karno specifically distinguishes cases such as the instant case, where the breach involves failure to provide insurance coverage. The Roths do not discuss this distinction or attempt in brief to distinguish the Select Properties, Ltd. case, which is also cited by the trial court in its reasons for judgment.
The Roths ask this Court to apply the equitable doctrine of judicial control to deny cancellation of their lease. This doctrine has been applied in the following illustrative situations:
The lessee withheld part of the rent on a gravel lease to pay severance tax under a mistake of fact. Brewer v. Forest Gravel Co., 172 La. 828, 135 So. 372 (1931).
The lessee mailed its rent check five days before the rent was due, but because of an oversight or fault in the delivery system, the check arrived six days late and the lessor refused to accept the payment. Edwards v. Standard Oil. Co. of La., 175 La. 720, 144 So. 430 (1932).
The particular lessor was required by law to collect rent at the lessee's dwelling[10], and there was evidence of the lessee's *1176 willingness to pay. The lessor refused payment received by the lessor's attorney eight days after the due date. Baham v. Faust, 333 So.2d 261 (La.App. 1 Cir.1976).
The lessee paid his rent semi-annually and relied in good faith on a rent receipt indicating he had paid up to October 1, 1939, although he had paid only through August 31, 1939. The lessor refused a tender made on October 2, 1939. Belvin v. Sikes, 2 So.2d 65 (La.App. 2 Cir.1941).
The lessee's failure timely to remit his rent was caused not by his fault but because of a malfunction of the bank's transmittal device and the intervention of a bank holiday. The lessee made a good faith effort to cure the default by submitting the rentals and paying property taxes and attorney fees. Tullier v. Tanson Enterprises, Inc., 359 So.2d 654 (La.App. 1 Cir.1978), writ granted and rev'd on other grounds, 367 So.2d 773 (La.1979).
Lessee had paid rent to end of lease term and was in the process of removing subtenant's property in accordance with the lease provisions, and had placed a sign of which the lessor was aware and had not complained. Stoltz v. McConnell, 202 So.2d 451 (La.App. 4 Cir.1967).
The lessee's wife paid the rent with a third-party check from his employer. The check was returned for non-sufficient funds and the lessee's wife tendered the rent the next Monday. Housing Authority of the City of Lake Charles v. Minor, 355 So.2d 271 (La.App. 3 Cir.1977).
The lessee erroneously believed his wife had paid the rent due on March 5, 1980. He learned of the error on March 10 and immediately mailed a check for the rent before having received a notice of eviction letter dated March 10, 1980. The Lessor had not given the lessee an opportunity to pay the past-due rent before taking action to terminate the lease and evict the lessee. The short length of time involved in the non-payment and the lessee's good faith efforts to correct the error convinced the court that the lease should not be cancelled. Atkinson v. Richeson, supra.
The Roths rely on Ergon, Inc. v. Allen, 593 So.2d 438 (La.App. 2 Cir.1992). Once again, good faith error was the cause of the lessee's failure to make a timely rental payment and the court applied judicial control to continue the lease. The lessee's general manager thought rental payments were paid by his company's home office in Jackson, Mississippi, and said that his predecessor had set up an automatic system by which the office paid the annual rental payments. Prior to the predecessor's retirement, he transferred the payment responsibility to the company's Monroe office, without having advised the new general manager of the change. Upon receipt of a termination and eviction letter, the manager immediately instructed his attorney to tender the past due rental, which the lessor did not accept. The court applied judicial control and maintained the lease.
We do not find these cases to support application of judicial control under the facts of the instant case. The Roths did not require proof of insurance from Voodoo Barbecue and did not carry the insurance required by the lease agreement. They did not provide proof that the Katrina loss was insured, and did not follow the directions of the Gurtler report in making repairs to the Goods' property. We cannot conclude that the Goods have not suffered a substantial loss as a result of the lack of insurance coverage. Upon our review of the record in its entirety, we find no policy of insurance showing coverage of the types required in the lease agreement either before or after August 29-30, 2005. We agree with the statement in Select Properties, Ltd. v. Rando, 453 So.2d at 982 that insurance is not a matter *1177 of minor importance, but is a major factor in maintaining a lease. The aftermath of 2005's catastrophe has removed any doubt concerning the validity of that observation. Mr. Roth's action in obtaining insurance at a "very high price" prior to making his repairs also confirms the importance of insurance coverage. We find no basis for application of the equitable doctrine of judicial control on the record before us.
In their fourth assignment of error, the Roths contend that the trial court erred in finding that the Goods' acceptance of certain rent checks did not vacate the notice of default and eviction proceedings.
Generally, acceptance of rent after notice of default constitutes condonation of the alleged default giving rise to reinstatement of the lease. Ernst Food Mart, Inc. v. Jackson-Atlantic Inc., 405 So.2d 1272 (La.App. 4 Cir.1981). However, whether the lessor in a particular case forgave a breach of the lease is a factual determination. See Illinois Cent. Gulf R. Co. v. International Harvester Co., 368 So.2d 1009 (La.1979).
We note that at all relevant times, the Roths led the Goods to believe that there was insurance coverage for the Katrina disaster, and that they were attempting to discover the identity of the carrier and agent. During that time, the Roths maintained possession of the leased premises, and it was not unreasonable for the Goods to continue to accept rental payments based on their good faith belief that the Roths would be able to cure the breach by presenting evidence that insurance had been and continued to be in place. Given these facts, we cannot say that the trial court's conclusion that the Goods did not intend to forgive the breaches of the lease agreement by having accepted rent payments prior to the eviction of the primary lessees was manifestly erroneous or clearly wrong.
Furthermore, Mr. Roth admitted that as of the date of trial he had not provided a copy of pre-Katrina or current property or flood insurance policies or proof of coverage for vandalism and malicious mischief as required by the lease agreement. Thus, the default has continued well after the Goods' negotiation of the last rental payment in July of 2006.
For the foregoing reasons, we affirm the judgment of the trial court maintaining the Rule for Possession.
AFFIRMED.
GORBATY, J., dissents with reasons.
GORBATY, J., dissents with reasons.
Because there is record evidence that the building was repaired sufficiently for the Louisiana Department of Health to issue a Permit to Operate, I do not find that the Goods suffered damages as claimed. I take judicial notice of the fact that following Hurricane Katrina, the Department of Health was diligent in insuring the public's safety in eating establishments that had been flooded and subject to toxic mold and other possible health risks.
Thus, although the record supports the fact that there was no insurance coverage at the time of the loss, because the Roth's have repaired the building out of pocket, I do not find that plaintiffs have proven damages sufficient to terminate the lease.
Accordingly, I dissent.
NOTES
[1] Ms. Saia accepted the Succession of her deceased husband and original lessee, Salvador M. Saia.
[2] The Roths refer to proceedings in the trial court testing the sufficiency of the bond. However, the record of these proceedings are not included in the record on appeal.
[3] The Amended Motion and Order is not in the record.
[4] This result has obtained where inadequate security is posted, See Womack v. Custom Homes and Renovations, 02-0193 (La.App. 4 Cir. 6/5/02), 820 So.2d 1196, and where the appeal is untimely, See Leake and Andersson, L.L.P. v. SIA Ins. Co. (Risk Retention Group), Ltd., 03-1600 (La.App. 4 Cir. 3/3/04), 868 So.2d 967.
[5] We note that the original lease also requires vandalism and malicious mischief coverage.
[6] We note that the original lease also required the lessee to provide insurance limits of 90% of the building's $750,000 stated value.
[7] The lease provided: "Unless otherwise provided herein, neither party shall have the right to cancel this lease for default of the other unless such default shall remain uncured for a period of thirty (30) days after notice in writing to such other party, specifying the nature of the default."
[8] Mr. Roth's counsel apologized to the Court for having suggested by his questioning that the $50,000 coverage applied to property damage rather than to liability.
[9] The brief filed on behalf of the Roths does not contain a second assignment of error.
[10] The lease did not provide for a place of payment and La.C.C. art. 2159 required the lessor to collect payment at the defendant's dwelling.